1              IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2
                              CASE NO:   00-06012-CIV-
3                             MIDDLEBROOKS
                              MAGISTRATE BANDSTRA
4    SKG CORP., d/b/a WE BUY
     PAWNBROKERS, a Florida
5    corporation,                    **COPY**

6              Plaintiff,

7    vs.

8    KEN JENNE, SHERIFF OF
     BROWARD COUNTY,
9                                    ┌─────────────────────┐
               Defendant.           │ FILED by _____ D.C. │
10   _____/   │ OKTO                 │
                                    │   SEP 2 9 2000       │
11   QUIK CASH PAWN & JEWELRY,      │  CLARENCE MADDOX     │
     INC., a Florida corporation,   │ CLERK U.S. DIST. CT. │
12                                  │ S.D. OF FLA.- MIAMI  │
               Plaintiff,           └─────────────────────┘
13   vs.                            CASE NO. 99-7630-CIV-
                                    MIDDLEBROOKS
14   KEN JENNE, SHERIFF OF          MAGISTRATE BANDSTRA
     BROWARD COUNTY,
15
               Defendant.
16   _____/

17                    FORT LAUDERDALE, FLORIDA
                      August 23, 2000
18                    10:00 a.m.

19
                      ---------------------
20

21                    DEPOSITION

22                    OF

23                    SGT. EDWARD SILEO

24

25

2

APPEARANCES:

    LAW OFFICE OF DENNIS R. BEDARD
    By: DENNIS R. BEDARD, ESQUIRE,
    Appearing on behalf of the Plaintiffs.

    PURDY, JOLLY & GIUFFREDA
    By: ALEXIS YARBROUGH, ESQUIRE,
    Appearing on behalf of the Defendant.


I N D E X


WITNESS                                    PAGE

SGT. EDWARD SILEO

Direct Examination by Mr. Bedard            3


E X H I B I T S

Plaintiff's Numbers 1-5 for Identification    3
Plaintiff's Number 6 for Identification      71

1        Deposition of SGT. EDWARD SILEO, a Witness

2  herein, taken pursuant to the Rules and Notice

3  heretofore filed before Shela K. Ellis, R.P.R., and

4  Notary Public, State of Florida at Large, at 1218

5  Southeast 3rd Avenue, Fort Lauderdale, Broward County,

6  Florida, on August 23, 2000, commencing at or about

7  10:00 a.m.

8            --------------------

9        (Thereupon, Plaintiff's Exhibit Numbers 1-5

10     were marked for Identification.)

11  THEREUPON:

12            SGT. EDWARD SILEO

13  a Witness herein, appearing at the instance of the

14  Plaintiffs and, having been first duly sworn by the

15  court reporter and cautioned to tell the truth of his

16  knowledge as to the within matters, was thereupon

17  examined and testified upon his oath as follows:

18            DIRECT EXAMINATION

19  BY MR. BEDARD:

20     Q.    Good morning, Detective.  My name is Dennis

21  Bedard, I represent Quik Cash Jewelry and Pawn and SKG

22  Corporation, the plaintiffs in this action.

23        Would you please tell me what your law

24  enforcement experience is.

25     A.    Total law enforcement experience?

1      Q.    Okay.    Let's --

2      A.    Started with the military police in the Air

3  Force in 1982.  Left there in October of 1986.  Started

4  with Boca Raton Police Department in February of 1987.

5  Left there in July of 1990 for the Sheriff's Office

6  here, and I have been here ever since.

7      Q.    So you have been -- since 1990 you have been

8  a sworn deputy for Broward County Sheriff's Office?

9      A.    Yes, that's correct.

10     Q.    Could you please briefly tell me what your

11 job categories or assignments have been with BSO.

12     A.    Certainly.  First assignment was with road

13 patrol in District 7, which is the Tamarac area.

14          In 1993, I went to the criminal

15 investigations section of that same district, dealing

16 with burglaries and thefts, that type of thing, those

17 types of investigations.

18          After that, about 1996, I was detached to our

19 technology department that deals with computers, and

20 established a database for secondhand property

21 transactions for the county.

22          And then after that, in August of 1998, I was

23 promoted to sergeant and took over the Career Criminal

24 Unit at that point.

25     Q.    Is there such thing within BSO as a pawnshop

1     detail or pawn detective or pawn unit?

2          A.   No.

3          Q.   So is there anybody in the Broward Sheriff's

4     Office who is specifically assigned to do pawnshop

5     inspections?

6          A.   No.

7          Q.   So within the entire Broward Sheriff's

8     Office, there is no such thing as a -- or there are no

9     units that we could say specialize in the inspection or

10    the supervision of pawnshops?

11         A.   No.  I mean, there is no unit that is

12    assigned to do that at all.  I mean, there is some

13    people within the agency that have taken an interest in

14    it and things like that, but there is no one

15    specifically assigned to do it.

16              The responsibilities for local law

17    enforcement oversight, so to speak, of pawn shops or

18    secondhand dealers throughout the county are the

19    responsibility of the district detectives in that

20    particular area.

21         Q.   I'm jumping ahead, but I want to ask this.

22    The reviewing of the pawn tickets that come in on a

23    daily or weekly basis from pawn shops within your

24    jurisdiction, those are reviewed by what is called a

25    district detective within that jurisdiction?

1    A.    Right.  The sheriff services 12 city-size

2    districts, and each one of those districts has

3    detectives assigned to it that handles property

4    crimes.  So those property crimes detectives, that is

5    part of their responsibility to find out what is being

6    transacted by the way of either pawnshops or secondhand

7    dealers.

8    Q.    Have you had any training by the Broward

9    Sheriff's Office or by anyone in the interpretation of

10   Section 539 Florida Statutes?

11   A.    Specific training by BSO, no.  I have

12   attended a few different training seminars and things

13   like that dealing with that.

14   Q.    When were these seminars?

15   A.    Oh, gosh, I don't recall exact dates, but

16   probably since 1993, I have attended maybe three or

17   four of them at different times.

18   Q.    Section 539 Florida Statutes was passed in

19   19 -- I believe 1996?

20   A.    Originally.  That was the original one and

21   then it was revised several times after that.

22   Q.    Have you had occasion to read Section 539

23   Florida Statutes?

24   A.    Yes.

25   Q.    When is the first time you read it?

1          A.    I would take a guess and say it would have

2     had to have been back in about 1993, when I got

3     assigned to the criminal investigation division.

4          Q.    At that point I think the statute was in

5     Section 538, which is the statute that deals with

6     secondhand dealers?

7          A.    Right.

8          Q.    Are you aware there is a statute, Section

9     538, that deals specifically with secondhand dealers,

10    and then there is another state statute, Section 539,

11    which deals exclusively with pawn shops?

12         A.    Right.  At the time it would have been 1996

13    when 539 came into existence.

14         Q.    Correct.

15         Q.    Are you familiar with the provisions of

16    Section 539?

17         A.    Generally familiar, yes, sir.

18         Q.    Other than litigation in this case, have you

19    ever had a meeting with an attorney about the

20    interpretation or generally about Section 539?

21         A.    I would have to say yes.  I mean I conversed

22    with our legal department asking different questions

23    about different things.

24         Q.    Do you ever recall specifically having a

25    meeting with one of your attorneys and discussing a

1    particular provision of Section 539?

2             MS. YARBROUGH:  I'm going to object to any

3        discussion that he may have with attorneys

4        regarding any meeting about this lawsuit or legal

5        counsel provided by the sheriff, and I will

6        instruct him not to answer on the privilege.

7             MR. BEDARD:  We will preserve the

8        objections.  You don't have to answer that

9        question.

10            Q.   (By Mr. Bedard) How many pawnshop inspections

11   have you done?  Let me rephrase it.

12            Generally since 1993, how many pawnshop

13   inspections have you inspected?

14       A.   I don't have an exact number.  They are

15   relatively routine, I guess you would say.

16            Again, those detectives that are assigned to

17   those particular units are charged with doing that.  I

18   mean, it's a fairly regular occurrence, at least for

19   the ones that are in those particular areas.

20       Q.   Would you say you have done more than 50?

21       A.   Probably to one extent or another.

22       Q.   How many have you done in the last month?

23       A.   None.

24       Q.   What is the Broward Sheriff's Office policy

25   in regard to inspections of pawnshops?

1    A.   To my knowledge there isn't one.

2    Q.   There is no policy on how to do pawnshop

3    inspections?

4    A.   No.

5    Q.   You have never read or you are not familiar

6    with any printed materials that the Broward Sheriff's

7    Office has published in regard to the inspection of

8    pawnshops?

9         MS. YARBROUGH:   Object to the form.  You can

10        answer.

11   A.   There are printed materials, you know,

12   outlining what you should be looking for, things like

13   that, but there is no set policy on it.

14   Q.   (By Mr. Bedard) I will show you what has been

15   marked as -- you can use my copy, there is a copy of it

16   there, it's got the BSO logo on the top.

17        Take a look at what has been marked as

18   Plaintiff's Exhibit number 4.  Could you please just

19   take a look at it.

20   A.   Sure.  Okay.

21   Q.   Are you familiar with this document?

22   A.   Yes, I am.

23   Q.   There is a pawnshop -- first two pages says

24   Broward County Sheriff's Office PawnTrac

25   Program/Pawnshop Inspection, and it's two pages.

1           The next set of documents there is something

2    called a Merchant Inspection Guidelines, and you have

3    read that?

4        A.    Yes, sir.

5        Q.    And we have a Pawn Shop Inspection Checklist,

6    and in parenthesis it says, "What to Look For"?

7        A.    Yes, sir.

8        Q.    The next document is called a Pawn Shop

9    Inspection Checklist, and that you are familiar with?

10       A.    Yes, sir.

11       Q.    And the next page is the Notice of Merchant

12   Violation, which is what you -- I guess BSO has for you

13   to issue in pawnshops who are in violation of the law?

14       A.    Yes.

15       Q.    And the last page, there are contacts in the

16   Division of Consumer Services, phone numbers and

17   addresses for you to contact.

18       A.    Right.

19       Q.    Does this document reflect and contain the

20   policy of the Broward County Sheriff's Office in regard

21   to inspection of pawnshops?

22           MS. YARBROUGH:  Object to the form.  You can

23       answer.

24       A.    Again, there is no specific policy on it,

25   this is a training guide.  You have to understand that

1   probably most law enforcement agencies have a policies

2   and procedures manual.  In the policy and procedure

3   manual for BSO, there is nothing specific towards

4   pawnshops, at least not to my knowledge.  I don't

5   believe I have ever read one and I have studied it

6   quite a bit.

7          These particular items that we are talking

8   about here come from a training manual about the

9   PawnTrac program.  The PawnTrac being a computerized

10  database for pawnshops and secondhand dealer

11  transactions throughout the county.  And, again, as a

12  training guideline for all the detectives for what to

13  look for in pawnshops.  So it's not a policy.

14      Q.   So you are saying that this Plaintiff's

15  Exhibit 4 does not reflect and contain a policy by the

16  Broward Sheriff's Office in regard to the inspection of

17  pawnshops?

18      A.   Not to my knowledge.  I don't believe the

19  administration has ever issued any policy on pawnshop

20  inspections.

21      Q.   What is the purpose of Plaintiff's Exhibit 4,

22  if you know?

23      A.   Again, it's a training guideline.  It's

24  explaining part of chapters 538 and 539; mostly 539.

25  But, it's just a training guideline explaining some of

1    the sections and telling people what to look for when

2    they conduct an inspection.

3         Q.    Do you know who wrote this?

4         A.    I did.

5         Q.    You wrote the entire --

6         A.    Myself and Detective Steinberg.

7         Q.    Do you know when you wrote this?

8         A.    Approximately a year to a year and a half

9    ago.

10        Q.    Did you have any legal advice when you wrote

11   it?

12        A.    I am sure I did.  Again, conversing with our

13   legal staff.

14        Q.    I just want to point out one area of this.

15   You say -- if you look at -- Look at the second

16   paragraph of the first page.  It says the following --

17   and I'm quoting -- "The State Legislature has a grace

18   period built into the Florida Pawnbrokering Act for law

19   enforcement to find this property.  The grace period is

20   30 days.  This is the time period that pawnbrokers and

21   secondhand dealers are obligated to hold property prior

22   to the pawnbroker offering it to the public for sale."

23   And it says 30 days is not a great deal of time.

24             What section of 539 says that there is a

25   grace period of 30 days?

1       A.   It doesn't specifically name or use the words

2  grace period.  I don't know the exact section because I

3  don't have 539 in front of me, but 30 days is provided

4  for by the pawnbrokers that they have to hold property

5  without altering it, so that the original person that

6  brought it to them can get it back.

7       Q.   So your understanding of the law -- of

8  Section 539, is that once property is pawned, the

9  pawnshop must maintain that property for 30 days after

10  the expiration of the pawn -- or for 30 days, and after

11  that 30 days they can sell to it the public?

12       A.   Not exactly.  30 days is the initial time

13  that the originating conveying customer has exclusive

14  right to purchase the property back.  After that there

15  is another 30 day hold period by the pawnshop.

16       Q.   The grace period under Section 539 is really

17  60 days from the date of the pawn?

18       A.   Only if it's a pawn, not a purchase.  If the

19  pawnshop had purchased it, then it would be 30 days.

20       Q.   Now, why did you and Detective Steinberg

21  write these documents, which are Plaintiff's Exhibit 4?

22       A.   I don't recall the exact reason.  I don't

23  recall whether we were asked to do this or whether we

24  asked for it to be done, but I know there had been some

25  questions back and forth from different detectives to

1    myself and a few other people that are interested in

2    pawnshops, and I guess collectively we thought it was a

3    good idea to put together a training manual.

4        Q.    I want to go through this with you.  Take a

5    look at page 3 of the Merchant Inspection Guidelines.

6    Looking at the last paragraph, and it says the

7    following, "Police deputies Do Not" -- and the "do not"

8    is capitalized -- "have the authority to determine

9    ownership of property.  If an item is party to a

10   criminal investigation, deputies cannot order the

11   property returned to an alleged victim.  The property

12   may be seized as evidence, with a proper property

13   receipt being given to the merchant listing the

14   merchant as a victim."

15        Is it your understanding that if you go into

16   a pawnshop and you discover that property is stolen,

17   that you can seize the property and give the store

18   owner a receipt for the property?

19        A.    That depends on the circumstances of the

20   case, but yes, that's acceptable.

21        Q.    Under those circumstances you would not have

22   to issue a hold order pursuant to Section 539?

23        A.    No.

24        Q.    You would have to issue a hold order?

25        A.    No, you would not have to issue a hold

1    order.  The section pertaining to that says a law

2    enforcement officer may issue a hold order, doesn't say

3    they have to.

4        Q.   Your understanding is -- let me make this

5    clear -- a law enforcement officer, if he discovers

6    misappropriated or stolen property in a pawnshop, can

7    seize the property, give a receipt to the pawnshop

8    owner, and you do not have to issue a hold order?

9        A.   Right.  The hold order is so that the

10   pawnshop holds --

11            MS. YARBROUGH:  Going to object as compound,

12        but go ahead.

13        Q.   (By Mr. Bedard) Do you understand the

14   question?

15        A.   I guess.  The hold order is so the pawnshop

16   maintains custody over the item in question.  Seizing

17   the property would basically put it in our evidence

18   unit, which again, as stated here, listing the merchant

19   as either the victim or the owner of the property until

20   it can be determined by a court.

21        Q.   Is it your position that if a law enforcement

22   officer discovers stolen property inside of a pawnshop,

23   that a law enforcement officer can seize the property,

24   give the pawnshop owner a receipt, and not have to

25   comply with the hold-order provisions of Section 539?

1    A.    That's the way I read the statute.

2    Q.    So your answer is yes?

3    A.    Yes.   The statute says may.

4          MS. YARBROUGH:    I object, compound.

5    Q.    (By Mr. Bedard) Is it the policy of the

6    Broward Sheriff's Office that if stolen property is

7    found inside of a pawnshop, that that property can be

8    seized from the pawnshop owner without complying with

9    the provisions -- without complying with the hold-order

10   provisions of Section 539?

11         MS. YARBROUGH:    Object to the form.   You can

12         answer.

13   A.    Again, I'm not aware of any policy regarding

14   that.   However, I know what has been done in the past

15   is that basically there is an option.   Either take the

16   property and hold it as evidence in a criminal

17   investigation, or issue the hold order and allow the

18   pawnbroker or whoever the merchant may be, secondhand

19   dealer, whoever, to retain custody over it with that

20   item on hold.

21   Q.    (By Mr. Bedard) And is the reason for this

22   distinction between complying with a hold order or

23   issuing a hold order and seizing the property -- is the

24   reason for that distinction that -- is the reason for

25   the distinction the fact that under one, the police

1   department can take the property itself and under the

2   latter, the pawnshop owner must keep the property?

3            MS. YARBROUGH:  Object to the form.

4        A.   Yeah, but I don't understand --

5        Q.   (By Mr. Bedard) Is it your interpretation or

6   is it the Broward Sheriff's Office's policy or its

7   interpretation of Section 539, that if a hold order is

8   issued on property, that that property must be kept

9   with the pawnbroker?

10           MS. YARBROUGH:  Object to the form.

11       A.   Yes.

12       Q.   (By Mr. Bedard) So it's your --

13       A.   It's my interpretation.  There is still no

14   policy.

15       Q.   Your interpretation of Section 539 is that

16   when a hold order is issued pursuant to that statute,

17   that the property that is the subject of the hold order

18   must be kept in the possession of the pawnbroker?

19           MS. YARBROUGH:  Object to the form.

20       A.   Yes.

21       Q.   (By Mr. Bedard) Okay.  I want you to read

22   539.001 on the packet you have, part of Exhibit 3.  I'm

23   sorry, go four pages from the back.  Take a look at the

24   539.001, paragraphs (16) 2.

25           Would you please read the first sentence of

1    that paragraph to me.

2         A.    "While a hold order is in effect, the

3    pawnbroker must upon request release the property

4    subject to the hold order to the custody of the

5    appropriate law enforcement official for use in a

6    criminal investigation."

7         Q.    So your interpretation of 539 as it pertains

8    to the requirement that property subject to a hold

9    order be maintained in the custody of a pawnbroker is

10   not correct, is it?

11        MS. YARBROUGH:  Object to the form.

12        A.    I'm sorry, you totally lost me on that one.

13        Q.    (By Mr. Bedard) Let me repeat the question.

14   I had asked you about two minutes ago whether or not it

15   was your interpretation of Section 539, that property

16   that is a subject of a hold order must be maintained in

17   the custody of the pawnbroker and you said yes, that

18   was your interpretation.  Is that still your

19   interpretation?

20        MS. YARBROUGH:  Object to the form.

21        Can I just ask you, why don't you ask him

22        when he does when he thinks property is

23        misappropriated.  You are asking leading, compound

24        questions.

25        MR. BEDARD:  I can ask a leading question,

1          and I can also ask compound questions.

2                MS. YARBROUGH:  You can't asked open-ended

3          questions in a deposition.  I'm not -- I am just

4          really trying to help clarify this.  If you can

5          ask him what the procedure is when you think

6          property is misappropriated, you might get the

7          answer you are looking for.

8          Q.    (By Mr. Bedard) Is it your interpretation of

9     Section 539, that when you issue a hold order on

10    property, that that property must be maintained in the

11    possession of the pawnbroker?

12         A.    Okay.  Generally, yes.  If there comes a

13    point in time when the item is needed for, maybe, a

14    testing.  Say in the case of a firearm, and it had been

15    placed on hold and kept in the custody of the

16    pawnbroker, then we needed to test the firearm to see

17    if it functions properly, things like that, then we

18    could request the pawnbroker to release it to us and

19    they would be obligated to do that.  Generally, yes,

20    the property stays with the pawnbroker until we needed

21    it for some other purpose.

22         Q.    Is there any law that says that?

23         A.    That says what? I just read it to you.

24         Q.    Well, the statute the way it's written says

25    that a law enforcement officer, once it places a hold

1    on property, once that hold is placed, a law

2    enforcement officer at any time, for any reason, can

3    take the property and put it in evidence from the

4    pawnbroker; is that correct?

5         MS. YARBROUGH:  Object to the form.

6         A.    Okay.  So let me find out exactly what you

7    are asking me.  What you are asking is that should we

8    have issued the hold order in regards to this property

9    that is in question and then asked to have it back?

10        Q.    (By Mr. Bedard) No, I'm not asking you that.

11   I'm asking you is there any legal restriction upon the

12   right of a law enforcement officer once it has issued a

13   hold order to seize the property that was the subject

14   of the hold order?

15        MS. YARBROUGH:  Object to the form.

16        A.    Actually, no, I don't think there is, but

17   this property was not subject to a hold order.

18        Q.    (By Mr. Bedard) Going back to Exhibit 4,

19   Plaintiff's Exhibit 4, the Merchant Inspection

20   Guidelines, and directing your attention to the

21   following sentence, which is the third sentence in that

22   paragraph, "The property may be seized as evidence with

23   a proper property receipt being given to the merchant

24   listing the merchant as a victim" -- let me withdraw

25   the question.

1          You would agree with me on this last

2    paragraph that you wrote there are three alternative

3    scenarios that deal with the disposition of stolen

4    property or -- I take that back.

5          You have testified there are three different

6    scenarios that deal with the disposition of property

7    that is the subject of a criminal investigation,

8    correct?

9          MS. YARBROUGH:  Object to the form.

10    A.    Not necessarily.

11    Q.    (By Mr. Bedard) Well, let me withdraw.  You

12    write that there are three ways that property the

13    subject of a criminal investigation can be handled.

14          The first way, going in reverse order, is

15    that the pawnshop owner and the victim can come to a

16    mutual understanding for the return of the disputed

17    property within ten days, correct?

18          MS. YARBROUGH:  Object to the form.

19    A.    Yes, that's a provision within the statute.

20    Yes.

21    Q.    (By Mr. Bedard) And the statute that allows

22    that is 539.001 (15).  Correct?

23          MS. YARBROUGH:  Object to the form.  Is there

24      a question?

25          THE WITNESS:  He's asking me if it's under

1      number 15.

2      Q.    (By Mr. Bedard) The last scenario, the ten

3  day provision, is codified under Section 539.  I'm

4  asking if he agrees with that.

5      A.    Yes.

6      Q.    Again, the next provision is that you write,

7  "The deputy" -- and I'm quoting -- "The deputy may

8  place a written hold order on the property for a period

9  of 90 days until a court determines ownership," and

10  that provision is codified in Section 539 Section 9,

11  excuse me.

12      A.    Should be Section 16.

13      Q.    Section 16, you are right.  Which deals with

14  hold orders, correct?

15      A.    Yes, sir.

16      Q.    Now the first provision, which is the seizure

17  of property by the police and giving the merchant a

18  receipt, is that sentence, that position or

19  interpretation codified anywhere in Section 539?

20      A.    No, that's a standard rule of evidence.

21      Q.    Excuse me?

22      A.    I said no.  That's a standard procedure

23  dealing with evidence.

24      Q.    As to the first sentence, in which you say

25  the property may be seized as evidence with a proper

1    property receipt being given to the merchant listing

2    the merchant was a victim, you would agree with me that

3    that position of the Broward Sheriff's Office is not

4    codified in Section 539?

5          MS. YARBROUGH:  Object to the form.

6       A.   Yes.  It's my position, though.

7       Q.   (By Mr. Bedard) It's your position that it is

8    not, there is no provision in Section 539 permitting a

9    law enforcement officer to seize property in a pawnshop

10   without placing a hold order on the property, correct?

11         MS. YARBROUGH:  Object to the form.  Asked

12   and answered.

13      A.   Right.

14      Q.   (By Mr. Bedard) Do you know of any written

15   law -- I guess if it's not written, it's not a law.

16         Do you know of any law that permits law

17   enforcement to seize property from a pawnshop that they

18   need in a criminal investigation?

19      A.   If it's evidence of a crime, it is seizable

20   in any form, whether it's from a pawnshop or not.

21      Q.   What is the source of this rule of law?  Is

22   it in the statute, is it in the constitution?

23      A.   I don't know offhand.

24      Q.   But you can't cite me any provision of law

25   that would permit this activity to occur?

1          A.    Specifically for a pawnbroker?

2          Q.    Yes.

3          A.    Evidence doesn't pertain only to a

4    pawnbroker, it pertains to evidence.  So, no, I

5    couldn't.

6          Q.    So, is it the position of the Broward

7    Sheriff's Office that if they -- is it the position of

8    the Broward Sheriff's Office that in seizing property

9    from a pawnshop, they are not bound by the provisions

10   of Section 539?

11              MS. YARBROUGH:  Object to the form.

12         A.    No, that is not what this is saying at all.

13         Q.    (By Mr. Bedard) Is it the position of the

14   Broward Sheriff's Office that when the Sheriff's Office

15   finds stolen property in a pawnshop, they are not bound

16   by the provisions of Section 539?

17              MS. YARBROUGH:  Object to the form.

18         A.    We don't state that anywhere in here.

19         Q.    (By Mr. Bedard) Is it the position of the

20   Broward Sheriff's Office, or is it the position of the

21   Broward Sheriff's Office that when you seize stolen

22   property from a pawnshop or property, you are bound by

23   the provisions of Section 539?

24         A.    We are dealing with two separate issues.  We

25   are dealing with rules specifically in Chapter 539

1    pertaining specifically to pawnbrokering, and then you

2    are asking about evidence.  It's two separate things.

3         Q.   Is it the position of the Broward Sheriff's

4    Office that in relation to the seizure of property from

5    pawnshops, that they do not have to comply with Section

6    539?

7         A.   Again, first of all, these particular things

8    that are written here are my words, there is no policy

9    from the Sheriff's Office.  That's one.

10        Number 2, when we are dealing with evidence

11   no matter where it's from a pawnshop or from a homicide

12   scene or anything else, it is seizable.  If it is

13   pertaining to something that is subject to a hold

14   order, as we are speaking about, then yes, we would

15   have to comply with the hold order.

16        However, this particular property that we are

17   talking about was not subject to hold order, no one was

18   claiming that it was misappropriated or stolen.

19        Q.   I'm going to review some other sections of

20   539 with you.

21        Going to the second page of the Pawn Shop

22   Inspection Checklist, there is a paragraph that says,

23   "Items not altered during the 30 day hold period."

24   I'm quoting.  It says, "Many pawnbrokers or secondhand

25   dealers have melted gold jewelry items or altered other

1    property they received during the initial 30 day hold

2    period because they purchased the item rather than

3    issued a loan."  And it says in bold type, "This is

4    illegal."

5            And I think we can agree that if a pawnshop

6    owner confiscates, melts down or puts up for sale

7    either pawned property or purchased property within

8    that 30 day grace period that we discussed, that would

9    be illegal, correct?

10        A.    Yes.

11        Q.    Now, you would also agree with me that once

12   the grace period, once the 30 day or 60 day grace

13   period, but once that grace expires, title to that

14   property, absolute title to that property is

15   automatically transferred to the pawnshop owner,

16   correct?

17        A.    Yes, sir, that's correct.

18        Q.    So if he buys property and waits 30 days,

19   that property after that 30 days is his and he can do

20   whatever he wants with it?

21        A.    That's correct.

22        Q.    And the same thing with pawned property.  If

23   a piece of jewelry is pawned, 30 days expires, after

24   that 30 days or 60 days, after the grace period, if the

25   pledger does not redeem his goods, absolute title to

1    that property is with the pawnshop owner?

2         A.    On a pawn after 60 days, correct.

3         Q.    That property is free and clear, according to

4    the law?

5         A.    Yes, sir, that's correct.

6         Q.    Now, going to the next paragraph, it says,

7    "All items in the store must be accounted for," and

8    I'm reading and I'm quoting directly.  It says, "Some

9    pawnbrokers keep personal items in their stores.  This

10   is fine so long as they have it separate from the

11   pawned merchandise and not displayed together.

12   However, personal or not, every item in the store must

13   have some proof of origin.  Whether it's from a

14   permitted vendor" -- and you cite "539.012 (m), receipt

15   for merchandise, or a pawn transaction form," and it's

16   in bold letters, "every item must be accounted for."

17   And you reference 539.001(8).

18              Now, is it the policy of the Broward

19   Sheriff's Office that a pawnbroker's personal property

20   be kept separate from pawned property?

21              MS. YARBROUGH:  Object to the form.

22        A.    Again, it's not the policy of the Sheriff's

23   Office, but I was asked to write this, and that's what

24   I wrote.  Those were my opinions.

25        Q.    (By Mr. Bedard) Who asked you to write it?

1    A.    Again, I don't recall whether I had asked to

2  put on this training manual and training class and

3  thing, or if they asked me to do this, but either way

4  it was done.

5    Q.    It is your interpretation of the law that all

6  personal property must be kept separate from pawned

7  property?

8    A.    In order for us to distinguish the difference

9  between what belongs to who in a pawnshop, yes,

10  absolutely.

11    Q.    Now, is it also your interpretation of the

12  law that a pawnbroker's personal property must be kept

13  separate from that property which he has for sale in a

14  pawnshop?

15    A.    Or it should be tagged some way that it's

16  their personal property.  They may be offering it for

17  sale, but what this is talking about here is there has

18  to be some way to determine origin of that property.

19        As a for-instance, if I were a pawnbroker and

20  I brought in my own personal lawn mower to sell it out

21  of my shop, that's fine, there is nothing saying I

22  can't do that, but I need to be able to account for

23  that item and show where it came from.

24    Q.    What provision of Section 539 says that

25  personal items must be kept separate from pawned items?

1           A.    There is no section that says that.

2           Q.    Is there any law anywhere in the state of

3    Florida, federal or state, that requires pawnshop

4    owners to keep personal items separate from pawned

5    property?

6                 MS. YARBROUGH:   Object to the form, calls for

7           a legal conclusion.

8           A.    Not to my knowledge, but there needs to be

9    some way to determine where that property came from.

10   As I cite here in 539.001(8), "At the time pawnbroker

11   enters into any pawn or purchase transaction, the

12   pawnbroker shall complete a pawnbroker transaction form

13   for such transaction, including an indication of

14   whether the transaction is a pawn or a purchase, and

15   the pledgor or seller shall sign such completed form,"

16   and it goes on to explain the form and other things

17   like that.

18                What that is telling me is that items that

19   are in that shop, as a pawnshop need to be accountable

20   somehow.  That it says, you know, all items, every time

21   they enter into a purchased or pawned transaction, they

22   must complete this form.  Therefore, if there is

23   something in that shop that does not have a form

24   attached to it in some fashion, whether it's from a

25   permitted vendor, which is allowable in another section

1    of the statute, or some type of origin of where that

2    property came from, in my mind that means that this

3    particular provision of the statute was not followed.

4        Q.   So it's your understanding of the law that

5    every item in a pawnshop, whether it be items that are

6    being pawned -- let me withdraw the question.

7        You would agree with me, would you not, that

8    pawnshops, as a general rule, do not keep or cannot

9    keep their pawns in public view?

10       A.   I don't know of any provision that prohibits

11   that, but I don't think I have ever seen it.  I take

12   that back.  I mean, I have seen large, bulky items that

13   may not fit in their normal back storeroom that they

14   usually have separate from the sale area and things

15   like that, where they would keep it out on the floor

16   because they can't get it through the door or

17   something, and it says not for sale and hold until such

18   date.  I mean, I have seen that before, but as a

19   general rule, they are kept separate.

20       Q.   And the reason, I think you would agree with

21   me, is because the pawns are not for sale, they are

22   collateral for a loan?

23       A.   Right.  Or they are part of that 30 or 60 day

24   hold period, right.

25       Q.   So, when you go into a pawnshop, you would

1    agree with me that the property that is being displayed

2    to the public is property that is for sale?

3        A.    Usually.

4        Q.    Well, I guess if a pawnshop owner had a car

5    that he pawned, obviously he's not going to put that in

6    a display case.  I mean, there is certain items, as you

7    mentioned, by a physical nature that is impossible, but

8    ^ by and large items that are on public display in a

9    pawnshop are items that are for sale to the public?

10       A.    Yes.

11       Q.    And you would probably agree with me

12   completely that jewelry that is displayed for the

13   public in a pawnshop is property that is up for sale?

14       A.    Usually, yes.

15       Q.    So, when you do a pawnshop inspection and you

16   see property that is in the display case or in plain

17   view, it's a virtual certainty that that property is

18   being sold by the pawnshop owner to the public and is

19   not pawned property, is not subject to a pawn?

20       A.    It was at one time.

21       Q.    It was at one time, but now it's a virtual

22   certainty that that property is either owned by the

23   pawnbroker and is being put up for sale by him?

24       A.    If things were done properly, yes.

25       Q.    And the same way that if you had walked into

1     a Wal-Mart and you would go into their gun case or

2     whatever, you would see items that one can

3     presumptively say this is owned by Wal-Mart and they

4     are putting it up for sale?

5          A.    Yes.

6          Q.    Going back to what we just previously

7     testified to, it's your position that a law enforcement

8     officer -- withdraw the question.

9          It's your position that with property that is

10    owned by the pawnbroker and is being placed for sale

11    with the public, that a pawnbroker for that property

12    must at all times be able to show to a law enforcement

13    officer the origin of the property and be able to

14    produce a pawnbroker transaction form for that

15    property?

16         A.    Absolutely.

17         Q.    And is it also your position that a law

18    enforcement officer has the right to inspect property

19    that is being placed for sale in a pawnshop, and that

20    the pawnshop owner has a duty to give the law

21    enforcement officer a copy of the pawned transaction

22    form or any paperwork related to that item?

23         A.    Yes, sir.

24         Q.    And this is true whether or not that property

25    has been up for sale for five years, six years or ten

1  years?

2      A.    That's what I believe, yes.

3      Q.    So it's your interpretation of the law that a

4  pawnshop owner has an absolute duty to produce for law

5  enforcement and for inspection, any property that it

6  has for sale and any records that are in his possession

7  that show the origin of that property?

8      A.    Yes.  Otherwise we wouldn't be able to

9  determine where the things came from.

10     Q.    And is this interpretation or your

11  position -- let me withdraw the question.

12         The question I just asked you about your

13  interpretation regarding the property placed for sale,

14  is your legal interpretation, is that also the position

15  of the Broward Sheriff's Office?

16         MS. YARBROUGH:  Object to the form.

17     A.    I couldn't answer that if I tried.  I don't

18  know what their position is.

19     Q.    (By Mr. Bedard) The position that you have

20  just stated in regards to the right of law enforcement

21  to inspect property that is placed for sale in a

22  pawnshop, have you implemented that policy or have you

23  implemented your interpretation of the law in the

24  course of your duties as a sheriff or deputy with the

25  Broward Sheriff's Office?

1     A.    You mean have I done those things?

2     Q.    Yes.

3     A.    Yes.

4     Q.    And you are engaging in those activities in

5  the regular course of your employment as a deputy

6  sheriff with the Broward Sheriff's Office?

7     A.    Well, not for some time now, but

8  pawnbrokering is not part of my normal course of

9  business, not any longer at least.

10    Q.    Your position, as far as the legal

11 interpretation that you've just stated -- I mean, you

12 have actually gone to pawnshops and implemented that

13 interpretation of the law?

14         MS. YARBROUGH:  Object to the form.

15    A.    I apologize, I may not understand that.  Are

16 you asking if I've gone to a pawnshop and said let me

17 see the pawnbroker transaction form on this particular

18 item in your display case out for sale?

19    Q.    (By Mr. Bedard) Correct.

20    A.    Yes.

21    Q.    If you went into a pawnshop and he had a

22 hundred pieces of jewelry for sale and he told you

23 this, "You know, I've owned this jewelry for 20 years

24 and I have it for sale," is it your position that that

25 pawnshop owner would have to, by law, produce for you

1    the transaction forms underlying his ownership of that

2    jewelry and allow you to inspect the jewelry?

3        A.    Yes.  We don't know whether it came in the

4    door five minutes ago or five years ago.

5        Q.    Is it also your interpretation that in regard

6    to a pawnshop owner's personal property, that he must

7    provide you proof of ownership of every piece of

8    personal property that he keeps in the pawnshop?

9        A.    Well, I've never truly encountered that,

10   however, I would probably have to answer yes.

11       Q.    So if a pawnshop owner were to bring in

12   his -- let's say he had his personal weapon, he brought

13   in a computer, his personal computer that he used, is

14   it your position if you went into the pawnshop he would

15   have to to you or show you proof of ownership of those

16   items?

17       A.    In my mind everything is based on a

18   reasonableness of what is occurring at the time.  Every

19   case is certainly different.

20           If the computer was located in the store

21   someplace in relative proximity to the other items that

22   are normally out for sale or on hold, not necessarily

23   in -- in other words, sitting on his desk like he was

24   working on a document on it or something like that,

25   yeah, I would be wondering where it came from,

1    absolutely.

2        Q.   If you went into a pawnshop to do an

3    inspection and there were, again, a hundred pieces of

4    jewelry for sale, and the pawnshop owner told you, he

5    says, "I'm sorry, this is items that were pawned five

6    years ago.  I have no records in my possession related

7    to this, it's my property," is it your position that at

8    that point that pawnshop owner is legally obligated to

9    produce for you the pawnbroker transaction forms

10   underlying those transactions?

11       A.   Yes.  Or some other type of origin.  In other

12   words, a permitted vendor or something like that.

13       Q.   Is it also your position if he does not

14   produce for you the transaction forms underlying those

15   transactions that you can then seize the property?

16       A.   At the time if I determined that this was an

17   action of failure to record, you know, information,

18   complete one of these transaction forms that I felt was

19   appropriate under the circumstances, yes, it would be

20   seizable as evidence.

21       Q.   I want you to take out your copy of 539, take

22   a look at 539.001, paragraph -- page 7, at the bottom,

23   paragraph (9) (a).  Would you please read the first

24   sentence to me.

25       A.   "A pawnbroker must maintain a copy of each

1    completed pawnbroker transaction form on the pawnshop

2    premises at least one year after the date of the

3    transaction."

4         Q.    So, if you go in -- the scenario that I just

5    recited to you a couple minutes ago, if you go into a

6    pawnshop and, again, you see the jewelry and it's --

7    the pawnshop owner tells you this was bought five years

8    ago, is it still your position that that pawnshop owner

9    must produce for you pawnbroker transaction forms for

10   that property?

11        A.    Some type of origin of that property, yes.

12        Q.    Could you please show me under either Section

13   539 or under some other Florida law the legal

14   authorization or the legal support for that position?

15             MS. YARBROUGH:   Object to the form, calls for

16        a legal conclusion.

17        A.    Under Section 8, which is getting back to the

18   pawnbroker transaction form.  It says whenever a

19   pawnbroker enters into the transaction, they shall

20   complete one of these forms.

21             If there is property in a pawnshop that does

22   not have one of these forms attached to it, be it from

23   five years ago, ten years ago or ten minutes ago, law

24   enforcement officers inspecting the pawnshop have no

25   idea when that property entered that pawnshop.  There

1    is no way for us to determine that, so we don't know if

2    that property entered the door five minutes ago or five

3    years ago as you are talking about.  In order for us to

4    determine that we would have to be psychic, I guess.

5         So, in order for the pawnshop to basically

6    prove to us that it did not enter five minutes ago, he

7    would need to show us some type of origin as to where

8    it came from.

9        Q.   (By Mr. Bedard) The position, the scenario I

10   just recited to you about your right -- or your opinion

11   that a pawnbroker must show you proof of origin of all

12   property in his shop through either a pawnbroker

13   transaction form or some other proof, my question is

14   very specific; can you show me specifically any law

15   that supports that position?

16        MS. YARBROUGH:  Objection, asked and

17        answered.  It is also objected to as a legal

18        conclusion.  He's not a lawyer or a judge and you

19        are asking him to cite law to you.  He answered

20        that question already.

21        MR. BEDARD:  Again, I think he has to answer

22        the question.

23        MS. YARBROUGH:  He did answer your question.

24        Q.   (By Mr. Bedard) Let me ask it again.  Is

25   there any law that supports the proposition that a

1    pawnshop owner must produce for you pawn transaction

2    forms or proof of ownership regarding every item that

3    he maintains in his pawnshop?

4            MS. YARBROUGH:  It's the same objection,

5        asked and answered, calls for a legal conclusion,

6        lack of foundation as to whether this witness can

7        answer legal opinions or conclusion.  I am going

8        to instruct him not to answer because he has

9        already answered that question.  You just don't

10       like the answer.

11           MR. BEDARD:  He did not. The question calls

12       for a yes or no answer.

13           MS. YARBROUGH:  I'm instructing him not to

14       answer.

15       Q.   (By Mr. Bedard) Legally, how long does a

16   pawnbroker in the state of Florida have to maintain or

17   keep pawnbroker transaction forms in his possession?

18       A.   In the shop or in his possession, or not

19   allowed to destroy it?

20       Q.   Not allowed to destroy it.

21       A.   Not allowed to destroy it, I believe it's

22   three years.

23       Q.   So the law in Florida is after three years

24   from the date of a pawn, a pawnbroker has no obligation

25   to maintain pawnbroker transaction forms, correct?

1          A.     That's correct under Section 12(c).

2          Q.     He's free to destroy pawnbroker transaction

3     forms after three years?

4          A.     That's correct.

5          Q.     But even though state law permits him to

6     destroy pawnbroker transaction forms after three years,

7     it's still your position that if after those three

8     years you go into a pawnshop and he doesn't have those

9     transaction forms or some other proof of ownership, you

10    have a right to seize the property?

11         A.     To a certain extent, yes, that's an accurate

12    statement.  Because, again, we don't know when the

13    property arrived there.  It doesn't necessarily have to

14    be the pawnbroker transaction form, it can be something

15    else indicating when and where they obtained that

16    property.

17         Q.     You say you didn't know when the property

18    arrived there?

19         A.     Yes.

20         Q.     What provision of Section 539 places on the

21    pawnbroker a duty to tell law enforcement when various

22    property arrived in his pawnshop?

23         A.     Actually, that's what the whole statute is

24    about.

25         Q.     Where does it say that?

1    A.    Well, going back to Section 8 again, it says

2    every time they enter into a pawnbroker transaction or

3    a pawn or purchase transaction, they shall complete one

4    of those forms and/or in other parts of the section

5    here, they have spots about permitted vendors when they

6    buy merchandise from another vendor or something like

7    that.

8        Q.    I think you would agree that when you go into

9    a pawnshop to do an inspection, you have a right to

10   inspect all of that pawnshop owner's existing pawns,

11   correct?

12       A.    Correct.

13       Q.    A pawnbroker has a duty and law enforcement

14   has a right to inspect all pawnbroker transaction forms

15   on all current pawns, correct?

16       A.    Correct.

17       Q.    Law enforcement also has a right and

18   pawnbroker has a duty to allow law enforcement to

19   inspect all property that is subject to a pawn,

20   correct?

21       A.    Correct.

22       Q.    It is your position, under Florida law, that

23   law enforcement has the right to go into a pawnshop and

24   to inspect all property that is in that pawnshop?

25       A.    Yes, that's correct.

1      Q.   It is also your position that, under Florida

2   law, law enforcement has the right to go into a

3   pawnshop and inspect pawnbroker transaction forms that

4   relate to every piece of property that is in the

5   pawnshop?

6      A.   Yes, that's correct.

7      Q.   And this right of law enforcement and, I

8   guess, duty of the pawnshop owner is -- applies whether

9   or not that property was pawned 1 year ago, 2 years

10   ago, 60 days ago or 10 years ago?

11      A.   Certainly.

12      Q.   And there is no time limit, whatsoever, on

13   law enforcement's right to go into a pawnshop, inspect

14   pawnbroker transaction forms, and inspect property in a

15   pawnshop?

16      A.   Correct.

17      Q.   Are you aware of any provision in Section 539

18   that places a restriction on law enforcement's right to

19   inspect property and transaction forms?

20      A.   There are certain guidelines that are set

21   down there, but I mean, if you are talking in a way of

22   determining when a particular piece of property came

23   into the possession of a pawnbroker, no.

24      Q.   Let me direct your attention to (10) (c), I'm

25   going to read it to you.

1      A.    (10) (c)?

2      Q.    (10) (c).

3      A.    (9) (c).  Okay.

4      Q.    Okay.  Sorry.  "All goods delivered to a

5  pawnbroker in a pawn or purchase transaction must be

6  securely stored and maintained in an unaltered

7  condition within the jurisdiction of the appropriate

8  law enforcement official for a period of 30 calendar

9  days after the transaction."

10          So when a pawnbroker does a pawn, he does not

11  have to maintain that pawn in his pawnshop, does he?

12     A.    Not -- in the shop?

13     Q.    Yes.

14     A.    No.

15     Q.    If he is a pawnshop, if he's in

16  unincorporated Broward County, he could maintain -- if

17  it's jewelry, he could maintain that anywhere in

18  Broward County, correct?

19     A.    Yes, that's correct.  It would still be

20  subject to inspection.

21     Q.    Absolutely.

22          He could keep it in his house if he wanted

23  to?

24     A.    Yes, I suppose.

25     Q.    The next sentence says, "Those goods

1    delivered to a pawnbroker in a purchase transaction may

2    not be sold or otherwise disposed of before the

3    expiration of such period."

4         What that means -- and let me know if you

5    agree with me -- that a pawnbroker cannot sell the

6    property to the public until 30 days has expired?

7         A.    Correct.

8         Q.    What it means "of such period", they are

9    relating to the 30 days, correct?

10        A.    Right.

11        Q.    Then the next sentence reads, "The pawnbroker

12   shall make all pledged and purchased goods and all

13   records relating to such goods available for inspection

14   by the appropriate law enforcement official during

15   normal business hours throughout such period."

16        What that means is -- correct me if I am

17   wrong -- that the pawnbroker has a legal obligation to

18   permit law enforcement officials to inspect both

19   property and records for a period of 30 calendar days

20   after the date of either the pawn or the purchase,

21   correct?

22        A.    At least the 30 days, yes.

23        Q.    Is there any -- well, would you agree with

24   me -- is your reading of this law that there is a legal

25   obligation on the pawnshop owner to allow law

sth

1    enforcement to inspect both property and records for

2    longer than the 30 days after the date of the pawn or

3    transaction?

4        A.    Well, there is no property in any pawnshop

5    that I have ever been into that is separated by the

6    date which they received it.  In other words, you know,

7    this property has been here for 31 days and this

8    property has been here 52 days.  There is absolutely no

9    way to do that.

10       Q.    But, sir, you did say earlier that when you

11   go into a pawnshop, it's a virtual certainty that the

12   property that is being placed for sale that you see on

13   display is property that is for sale, and that property

14   that is the subject of a pawn is not for sale, it's out

15   in the back somewhere, it's in a separate area,

16   correct?

17       A.    Generally, and that's if the pawnbroker

18   complied with the law.

19       Q.    So, when you go into a pawnshop, based on

20   your experience -- and you have already testified to

21   this -- it's a virtual certainty, unless it's a car or

22   some large piece, jewelry or whatever property is in

23   the display case or in public view is property that is

24   for sale.

25            MS. YARBROUGH:  Object to the form.

1       A.    Again, if the law had been complied with,

2   yes, that would be true.  But, I mean, there is nothing

3   saying that jewelry that you are speaking of or

4   anything else, whether it be a TV or VCR or whatever it

5   is, there is nothing saying that one of those items

6   that's not supposed to be out for sale can't be moved

7   to the area that's, you know, on display for sale.  So

8   all that property would be subject to inspection to

9   make sure that it is proper.

10      Q.    (By Mr. Bedard) The section that I just read

11  to you, and I will read it again, "the pawnbroker shall

12  make all pledged and purchased goods and all records

13  relating to such goods available for inspection by the

14  appropriate law enforcement officials during normal

15  business hours throughout such period."

16          After reading that sentence, is it your

17  understanding that despite that language, pawnbrokers

18  have a legal duty to allow law enforcement to inspect

19  both their property and the records underlying that

20  property even if 30 calendar days have expired since

21  either the date of the purchase or the pawn?

22      A.    Yes.  If I could direct your attention to

23  Section (12) (b), one of the prohibited acts is a

24  pawnbroker, or an employee or agent of a pawnbroker,

25  may not refuse to allow the agency, the appropriate law

1    enforcement official, the state attorney, or any of

2    their designated representatives having jurisdiction,

3    to inspect completed pawnbroker transaction forms or

4    pledged or purchased goods during the ordinary hours of

5    the pawnbroker's business or other time acceptable to

6    both parties.

7        Q.    You are right, that is the law, but your

8    interpretation -- we agree that there is a provision of

9    539 that says that a pawnbroker is only legally

10   obligated to allow law enforcement to inspect property

11   and transaction forms in which 30 days -- a 30 day time

12   period has not gone by since the date of the

13   transaction, correct?

14       A.    I don't believe that says it anywhere there.

15   I don't believe that it limits us only to 30 days.

16       Q.    So Section (9)(c), your interpretation is

17   that that section, despite what it says, there is still

18   a legal requirement that pawnshop owners allow you to

19   inspect property and forms for property that they have

20   had possession of for greater than 30 days?

21       A.    Absolutely.

22       Q.    I think you mentioned earlier about tagging.

23   Is it your position that every piece of property in a

24   pawnshop must be tagged or have some identification

25   form on it with the pawn transaction number, with the

1    ticket number for the pawn that it relates to?

2        A.    No, but it would be very helpful.

3        Q.    You would agree with me there is no legal

4    requirement mandating a pawnshop owner to tag all his

5    property?

6        A.    No.  I mean yes, I do agree with you.

7        Q.    I have a couple areas, then I'm going to

8    start going into the incidences in this case.

9             Let's assume you are doing an inspection of a

10   pawnshop, and when you go into the pawnshop -- you may

11   not agree -- you have a right when you go into that

12   pawnshop to examine all pawn transaction forms for

13   current pawns that have not expired, correct?

14       A.    No, I don't think there is any time period at

15   all.

16       Q.    We can agree that when you go into a

17   pawnshop, you have a right to inspect pawnbroker

18   transaction forms and property related to those pawns

19   for the pawns that have not expired as a matter of

20   law?

21       A.    At least that, yes.

22       Q.    You say at least.  When you go into a

23   pawnshop, you meet with the pawnshop owner, and you say

24   to him -- you have a right to ask him, to say to him,

25   "Show me all your existing pawns"?

1    A.    Yes.

2    Q.    He then shows you, "All right, Officer, here

3    are all the existing pawns that I have right now." And

4    you can look at them, correct?

5    A.    Yes.

6    Q.    In addition to that, under Section 539 the

7    police department would already know about his existing

8    pawns, would they not?

9    A.    If the law had been complied with, they

10   should, yes.

11   Q.    So, because most police departments

12   download.  I mean, you use Pawn Tracker (sic), correct?

13   A.    Yes, something like that.  It's a

14   computerized system, yes.

15   Q.    And I can't speak for every pawnshop, but I

16   know probably 75 to 80 percent of pawnshops download

17   their forms and send them to -- they are obligated to

18   give them to the police department on a daily basis,

19   correct?

20   A.    To my knowledge, all the ones in Broward

21   County are doing that, yes.

22   Q.    So right now every pawnshop that uses BSO --

23   A.    It's the whole county, but go ahead.

24   Q.    So right now every pawnshop in Broward County

25   downloads by computer?

1      A.   To my knowledge.  I mean, there may be a few

2   exceptions, but I have been out of this type of

3   business for a little while, but to my knowledge, yes,

4   they do.

5      Q.   And by law those forms, the pawnbroker

6   transaction forms, have to be turned over to the

7   appropriate law enforcement official or agency on a

8   daily basis, correct?

9      A.   The forms, no.  The statute provided for

10   either/or.  They are not obligated to, but a lot of

11   them still do because they don't want the burden of

12   maintaining some of the extra forms and things.  I

13   believe it's under Section 9, they have the option to

14   do either/or.

15      Q.   They can do it either by computer or they can

16   do it manually, also?

17      A.   I'm saying they don't have to do both.  I'm

18   sorry.

19      Q.   You are right.

20      A.   They don't have to do both.  You mentioned

21   the form.

22      Q.   This computerization is a whole other --

23      A.   I didn't mean to confuse you.

24      Q.   Your position is, and I'm assuming you are

25   correct, that almost every pawnshop or every pawnshop

1    in Broward now downloads the forms by computers?

2        A.    The transaction information.

3        Q.    The information is in by computer?

4        A.    Yes, sir.  Yes, sir.

5        Q.    And you said they are not legally required to

6    do it by computer, but everybody does it now.

7            My question was, the information on the forms

8    must be given to the appropriate law enforcement

9    official with -- withdraw the question.

10            The pawnshop owner is legally required to

11   provide the appropriate law enforcement official with

12   the information on those pawnbroker transaction forms

13   on a daily basis?

14       A.    Unless some other arrangement has been made,

15   yes, that's correct.  Within 24 hours.

16       Q.    The law says 24 hours unless other

17   arrangements have been made?

18       A.    Yes.

19       Q.    It's probably your experience and it is also

20   my experience that this is a law that is probably

21   honored more than breached, because most pawnshops

22   probably give the appropriate law enforcement official

23   this information on a weekly basis?

24       A.    That's correct, and that's part of the

25   "unless otherwise agreed upon".  We accept weekly.

1      Q.    Most police departments accept the downloads

2   on a weekly basis?

3      A.    Yes, sir, that's correct.

4      Q.    So, when you go into a pawnshop at any given

5   moment, you will already have access to that pawnshop's

6   records for at least the three previous weeks or even

7   the last year for every pawn he's done?

8      A.    Yes. Not from the pawnshop, but yes.

9      Q.    But from your own data, the police

10  department's database?

11     A.    Yes, we have access, yes.

12     Q.    When you go in and ask a pawnshop owner let

13  me look at your pawn transaction forms, he is probably

14  not going to have the form.  He will have the form, but

15  he could say to you, look, I give them to you every

16  week; because you already have them, correct?

17     A.    I mean, there are other reasons for looking

18  at the forms.

19     Q.    Obviously, and looking at the property?

20     A.    Yes.

21     Q.    And it's your position that once he shows

22  you -- if he shows you all his pawns and the property

23  that relates to those pawns, it's your position that

24  over and above that, you have the right as a law

25  enforcement official to search all other property in

1    his pawnshop, and that the pawnbroker has a legal

2    obligation to provide you with the pawnbroker

3    transaction forms related to that property or some

4    written or some proof that he actually owns the

5    property?

6            MS. YARBROUGH:  Object to the form,

7        compound.  You can answer.

8        A.    Yes.

9        Q.    (By Mr. Bedard) And it's also your position

10   that if the pawnbroker does not provide you with this

11   information, you then have a legal right to confiscate

12   the property that is in the pawnshop, correct?

13       A.    You are saying if there is no, say, some type

14   of certificate of origin or something like that?

15       Q.    Correct.

16       A.    As evidence, yes.

17       Q.    Let's say you go into a pawnshop and he has a

18   hundred bicycles for sale, and you say to him, "I want

19   to see all your pawns." He shows you every existing

20   pawn he has, shows you the forms, and he shows you the

21   property, and then he tells you, "See all these

22   bicycles, I have owned these bikes for ten years, I

23   have a bike collection and now this is going to be

24   sold.  These are my bikes, I have had them for sale

25   here for years." It's your position, if he does not

1    produce for you some proof that he owns those bicycles,

2    you then have a legal right to seize those bicycles and

3    take them in as evidence?

4         A.    Yes.

5         Q.    Have you ever provided hold orders to

6    pawnshops?

7         A.    Yes, I have.

8         Q.    Do you remember specifically how many you've

9    done?

10        A.    No, I don't.

11        Q.    What is your understanding of the

12   circumstances under which a hold order is required?

13        A.    If an item that is in question is at least

14   alleged to be misappropriated, to use the words of the

15   statute, in other words, generally stolen or something

16   along those lines, then there is the option of issuing

17   a hold order to the pawnbroker.

18        Q.    But it's also your position, your

19   interpretation, under Section 539, if you find

20   misappropriated property in a pawnshop, in addition to

21   a hold order you can just seize the property if you

22   want?

23        A.    Well, there is no point in actually giving a

24   hold order because it's actually asking them to hold

25   it.  But yes, if it's evidence, it can be seized, yes.

1      Q.   So the hold order provisions of Section 539

2   are not the exclusive means by which law enforcement

3   will seize stolen property or misappropriated from a

4   pawnshop, you can also seize it as evidence?

5      A.   Right.   A hold order isn't a seizure, but

6   yes.

7      Q.   Going back, using my bicycle analogy.   Again,

8   if you go into a pawnshop and you seize that

9   property -- and you said you would seize -- if there

10  were a hundred bicycles, you would seize those hundred

11  bicycles as evidence?

12     A.   Maybe, maybe not.

13     Q.   If you wanted to, you could?

14     A.   Yes.   I mean, if I were going to charge the

15  corporation with failure to maintain records of those

16  or failure to provide some type of certificate of

17  origin or whatever you want to call it as to where

18  those things came from, possibly believing that they

19  came in the door five minutes ago and that the

20  pawnbroker or merchant had not complied with the

21  requirement to complete a transaction form, yes.

22     Q.   So it's your position that you could then

23  pull up a BSO truck and take those bicycles into

24  evidence?

25     A.   Giving the merchant a receipt for the items,

1    but yes.

2         Q.   Have you ever applied for a search warrant?

3         A.   Yes.

4         Q.   Under the scenario I just told you, assuming

5    your interpretation of the law is correct, why would

6    you not apply for a search warrant and get a search

7    warrant from a judge to take the bicycles?

8         A.   Why would I need to?  It specifically states

9    we are allowed to inspect.  A search warrant is

10   authorization from a court to provide for an inspection

11   of a person's property or something along those lines.

12   The legislature has already provided that.

13        Q.   Where?

14        A.   Under Section 12, where it says it's a

15   prohibited act to refuse to allow a law enforcement

16   officer to inspect the premises.

17        Q.   Obviously, your position is there is no 30

18   day restriction in the provision?

19        A.   No, because, again, there is no -- at least

20   not that I have ever seen -- feasible way to have

21   either the pawnbroker or law enforcement determine

22   which items that may be out for sale in a display case

23   to be shown as either 30 day holds, been here for 50

24   days or whatever.

25        Q.   I will get off this in a minute.  It says

1    that, "Refuse to inspect transaction forms or inspect

2    pledged or purchased goods"?

3        A.    Correct.

4        Q.    Where in 539 does it give you the right then

5    to seize the property?

6        A.    I said that before.  It's not in Section

7    539.  If they are being seized as evidence, they may be

8    seized, period.

9        Q.    It is your position -- even if there is such

10    a position of law allowing you to do that, it is your

11    position that you would not need a search warrant to

12    seize the property?

13        A.    No.  Evidence is seizable any time.  When we

14    go to a homicide scene, we seize evidence all the time.

15        Q.    So it's your position that when law

16    enforcement wants to seize evidence, they don't need a

17    search warrant?

18        A.    Not all the time.

19        Q.    Suppose -- I'm not going to argue the law.

20            Okay.  Let's go direct your attention to --

21    let's start with the Quik Cash inspection.  This took

22    place on December 1999?

23        A.    Yes.

24        Q.    Now there were three pawnshops that were

25    inspected.  There was the Quik Cash pawnshop, which is

1    Quik Cash Pawn & Jewelry that is at 2714 Sunrise

2    Boulevard in Fort Lauderdale?

3         A.    Sunrise Boulevard.

4         Q.    That was on December 2nd.

5               On November 30, 1999, about 1:20 or 1:00 in

6    the afternoon, you did an inspection of We Buy

7    Pawnbrokers, which is at 3481 Northwest 19th Street in

8    Lauderdale Lakes; is that correct?

9         A.    Yes, sir, that's correct.

10        Q.    Then there was also Citi-Pawn on State Road

11   84 in Davie?

12        A.    And six others.

13        Q.    There were six others?

14        A.    Yes, sir.

15        Q.    The Citi-Pawn is at 13060 State Road 84 in

16   Davie, and that was done also on December 2nd?

17        A.    Yes, December 2nd.

18        Q.    You said there were another three or another

19   six?

20        A.    Another six.

21        Q.    And where were those other six?  What are the

22   names of those pawnshops and what are the dates?

23        A.    I don't know the exact dates of those.  It

24   was sometime during the same period.

25        Q.    I don't need the names.  It was the same

1    period of time?

2         A.    Generally.    They were all within about two or

3    three days of each other.

4         Q.    So there were a total of nine pawnshops that

5    were inspected over a -- during a week's period of

6    time?

7         A.    It was more like two or three days, yeah.

8         Q.    What caused the inspection of these

9    pawnshops?    What caused you to inspect these nine

10   pawnshops within that two to three-day period?

11        A.    Well, initially, it started with We Buy

12   Pawn.    And the basic circumstances were that there were

13   some detectives from the City of Fort Lauderdale that

14   came to me, had explained that a reported victim of

15   theirs -- I assume a victim of a burglary, I believe

16   that's what they told me -- had stated they had gone

17   to We Buy Pawn, had asked for a particular type of

18   jewelry.    I believe it was a ring.    And it was not -- I

19   mean, they were looking for something in a display

20   case, they didn't see it.    Asked one of the people

21   there about it, and they said well, we have something

22   like that.    Brought a ring from the safe, showed it to

23   her.    She said okay, I will be back a little bit later

24   or something like that.

25             Apparently that person went back to the City

1   of Fort Lauderdale detectives, and said my ring that I

2   reported stolen in my burglary is over at this

3   pawnshop, being We Buy Pawn.  And sometime in there --

4   I don't know the time frame of Fort Lauderdale's

5   investigation, but sometime I'm assuming very soon

6   after that person told them that -- they went over to

7   We Buy Pawn, confronted the -- I assume it was the

8   owner.  I don't know who they spoke to.

9            Initially they said no, we don't have it, we

10  don't know what you are talking about.  And I guess

11  they brought up the fact that there was this person who

12  had seen it just a few minutes ago.  And he said, oh,

13  you mean this one kind of thing.  I guess eventually

14  they found it, brought it out, asked for the

15  documentation as to who had brought it to them, and

16  they didn't have it.

17           They brought that information to me, and at

18  that point I thought it appropriate to go make an

19  inspection of We Buy Pawn, being that they had at least

20  allegedly undocumented items in their store.

21      Q.   And who went with you?  You went there on

22  November 30th?

23      A.   I think it was, yes, November 30th.

24      Q.   Who went there with you?

25      A.   Detective Joel Steinberg.

1        Q.    What happened when you went there?

2        A.    We told the owner, and I believe it was his

3    son, and there was another worker there, his first name

4    was Mike, I don't recall his last name.

5        Q.    The owner, was it Mr. Goldstein, a rather

6    large gentleman?

7        A.    I know him as Bernie.

8        Q.    I bet you remember he was big, though?

9        A.    Yes, he was big.  He was there, I believe it

10   was his son that was there also, and the other clerk,

11   Mike, who I had known from a different pawnshop that he

12   used to work at.  And we told him why we were there and

13   they told us to go ahead and do what we got to do.

14       Q.    So what did you do?

15       A.    Well, we -- I went to the back room, started

16   looking through the items in the back, seeing that

17   things were tagged, as we had talked about earlier,

18   where they had some type of corresponding number to a

19   transaction form.

20            And I didn't find anything out of the

21   ordinary back there.  A little messy, but that's a

22   personal opinion.  But didn't find anything out of the

23   ordinary back there.

24            Detective Steinberg had started with the safe

25   area, being that that's where the ring was, and --

1      Q.   Did he go into the safe?

2      A.   Yes.

3      Q.   Did he ask somebody for permission to go into

4    the safe?

5      A.   I don't know.  I don't believe I was standing

6    there.

7      Q.   But he went in and he retrieved property from

8    the safe?

9      A.   Yes.

10     Q.   What did you do next?

11     A.   Eventually, after I was finished with the

12   back room there, I came up and helped him inventory

13   things that he found that were not tagged or that they

14   couldn't provide some type of explanation for.

15     Q.   Did you review all of the existing pawns or

16   all of the pawns at We Buy Pawn?

17     A.   We reviewed the tickets that they had on

18   hand, but again, like the computerized information we

19   spoke about before, and maybe whatever tickets they may

20   have sent in, may or may not have sent in, I don't know

21   if they send their tickets in in conjunction with the

22   electronic transfer, but that, you know, database

23   information is not available in the field, so no, I

24   couldn't check that.

25             But we checked some of the records that they

1    had there and asked them to provide -- you know, when

2    we found something that we couldn't match up with a

3    pawnbrokering ticket for, we asked them to tell us

4    where it came from or figure out what receipt

5    corresponded with this particular item.

6         Q.   So what you did -- well, when you went in --

7    when you first went in there, your purpose of doing the

8    inspection was to locate this piece of jewelry that a

9    victim had reported stolen?

10        A.   No.  It's my understanding that Fort

11   Lauderdale had already recovered that.  It was our

12   purpose to go back and see if there were any other

13   undocumented items.

14        Q.   I am going to show you Plaintiff's Exhibit

15   Number 2.  At the start of the first page, the first

16   description, it says Old Navy watch.

17             Now on this page there are ten items of

18   jewelry.  You seized each of these items of jewelry

19   from the We Buy Pawnbroker shop?

20        A.   Yes, there is more than ten items.

21        Q.   I see there is a lot more.

22        A.   See how this works here?  It's like 11 clear

23   stones, that's just item number 1, 2, 3, 4.  There is

24   11 clear stones, white metal tags, things like that.

25   There is more than ten items, but yes.

1      Q.    Okay.  Obviously they are listed ten items,

2  some of these items are more than one piece?

3      A.    Yes.

4      Q.    So each of these items were seized?

5      A.    Yes.

6      Q.    Were any of these items existing pawns, were

7  they pawned property for which the 30 day grace period

8  had not expired?

9      A.    I don't know.

10      Q.    Did you ask Mr. Goldstein to look at all his

11  existing pawn tickets?

12      A.    Yes.

13      Q.    And he showed them to you?

14      A.    He showed them to Detective Steinberg, not to

15  me.

16      Q.    As far as you know -- you can only testify

17  about what you know -- of your own personal knowledge,

18  were any of these ten items, were you able to match

19  them up with any of We Buy's existing pawns?

20      A.    No.  If we had been able to do that, they

21  would have remained there with the shop.

22      Q.    Did you have a conversation with anyone at

23  the pawnshop about these items, who owned them, why

24  they were --

25      A.    Yes, we did that with all the items that were

1    taken.

2        Q.    Who did you talk to and what was said?

3        A.    Actually, any one of the three clerks.    And

4    as far as exact wording, I couldn't tell you, but we

5    were asking them to produce some type of origin as to

6    where these things came from.

7        Q.    And what did they say?

8        A.    Well, there were different items that they

9    could produce things for, and some that they could not

10    produce things for, and when they did the items

11    remained there at the shop.    When they did not, those

12    were the items that are listed.

13        Q.    On the first page, these items of jewelry,

14    were these items out in the display case or were any

15    where the pawns were?

16        A.    If I remember correctly, all of the items at

17    We Buy Pawn, with the exception of very few, came from

18    the safe area.

19        Q.    Now, did Mr. Goldstein or one of the

20    employees show you where his pending pawns were?

21        A.    Yeah.    Actually, they were all mixed in with

22    the safe, regarding jewelry items they were.

23        Q.    So you went into -- these items that you

24    seized were items that they could not produce any form

25    for?

1      A.    Yes.

2      Q.    Did you ask him whether or not these were

3   pawned or whether or not he owned them?

4      A.    Yes. I don't know if we asked him in those

5   exact words.  We asked him to tell us where they came

6   from and who owns them, yes.

7      Q.    Did he ever tell you that this was his

8   property and they were not pawned?

9      A.    In some cases I don't recall him saying they

10  were specifically his property.  Regarding these

11  particular items right here?

12     Q.    Yes.

13     A.    Just these ten?

14     Q.    Let's do all of them.

15     A.    Items that I recall they said were their

16  personal property, for all the items that were seized

17  out of We Buy, I remember two specific items.  One was

18  a laptop computer which I believe they said they had

19  bought at the Swap Shop, and another was a handgun that

20  -- I don't recall where they said they bought it, but

21  they said that it belonged to his son.

22            As far as anything else in the store, the --

23  what we called collectible coins, kind of old silver

24  type coins and things, their explanation to us at the

25  time was that's just part of the regular currency in

1    the store.

2        Q.    So, as to all the items that were seized, you

3    had no information as to whether or not these were

4    active pawns, or whether they were pawns that whose

5    default date had come and gone, or they were just

6    personal property of the owner?

7        A.    No idea other than, again, to my knowledge I

8    don't recall them claiming any of the jewelry items as

9    their personal property.

10       Q.    The only items that you knew or had reason to

11   know was personal property was the handgun and the

12   computer?

13       A.    Right.

14           MS. YARBROUGH:   The coins he said.

15       Q.    I'm sorry. And the coins?

16       A.    The coins they said, again, was part of the

17   regular currency for the store.

18       Q.    And where were the coins found?

19       A.    In the safe also.

20       Q.    And the computer was found where?

21       A.    I don't know exactly because I believe

22   Detective Steinberg looked at that originally.  I know

23   it was not out for sale, it was not on display or

24   anything like that.  It was behind the counter where

25   they take property in.

1    Q.   That's the computer?

2    A.   Yes.

3    Q.   Why was the computer seized?

4    A.   Again, because it had no tag, they couldn't

5    tell us where it came from.  It was a used computer.

6    The fact that he said it was his personal one, we

7    couldn't determine that at the time, so we thought it

8    best that a judge determine whether they had complied

9    with the law or not.

10         And when we turned it on, the part of a

11   registry in the computer shows who the owner was, and

12   it had a different person's name in there.

13   Q.   You actually turned the computer on and

14   looked at what information was in the computer?

15   A.   Right.

16   Q.   Where was the handgun located?

17   A.   Again, Detective Steinberg could probably

18   tell you exactly where he located it first.  I don't

19   know.

20   Q.   Why was that seized?

21   A.   If I remember correctly again, at the time

22   there was nothing telling us where it came from or

23   anything like that.  It was not in his possession at

24   the time.

25         I believe it was later on that we had found

1   out it had been reported stolen, but I don't believe

2   that part took place in the store.

3       Q.   So looking again at Plaintiff's Exhibit 2,

4   the first six pages of property, these items were all

5   items that were seized by the Broward Sheriff's Office

6   during an inspection of the We Buy Pawnshop on November

7   30th?

8       A.   Yes.

9       Q.   Just splitting hairs here.  All of the

10  property receipts that are listed here -- there are 19

11  pages of property receipts.

12      A.   Actually, there is 20.  They should be

13  numbered at the top.

14      Q.   There are 20 pages of property receipts.  Now

15  all of this property was seized during an inspection of

16  the We Buy Pawnshop on November 30th of 1999?

17      A.   Yes, sir.

18      Q.   And the reason this was seized -- withdraw

19  the question.

20           Did you put a hold order on any of this

21  property?

22      A.   No, sir.

23      Q.   And the reason it was seized is because it's

24  your interpretation of the law that a pawnshop owner

25  must provide you with documentation for every item that

1    is in his pawnshop, correct, and this pawnshop was not

2    able to do that?

3              MS. YARBROUGH:  Objection, compound.

4        A.   To a certain extent, yes, that's correct.

5        Q.   (By Mr. Bedard) And the same applied now to

6    the coins.  Was there a cash register?

7        A.   Yes, sir.  Well, I don't know if you would

8    call it a cash register.  I think there is a cash

9    drawer type thing.  Most of them don't use a cash

10   register.

11       Q.   These coins, they were regular currency?

12       A.   Excepting being very old, yes.

13       Q.   Is there anything when you were looking at

14   it, was there anything distinctive from a pile of coins

15   I could take out of my pocket?

16       A.   Absolutely.  Old, silver, collectible coins.

17   Kind of like early 1900s, early 1800s, things like

18   that.  They were old coins.

19       Q.   You seized all this currency because they

20   were not able to provide you any proof of ownership?

21       A.   Yes.  Or a corresponding pawn ticket, yes.

22       Q.   Is there any reason why you didn't, after

23   making this discovery, why you didn't apply and get a

24   search warrant with a judge?

25       A.   I don't believe Chapter 539 requires that.

1    Q.    Even if you had a legal right to seize this,

2    you are saying you did not need a search warrant?

3    A.    Yes, sir.

4    Q.    Did you make any arrest that day of anybody

5    at We Buy Pawnbrokers?

6    A.    No, sir, we just filed charges against the

7    corporations.

8    Q.    Have charges been filed against We Buy

9    Pawnbrokers?

10    A.    I don't know to be honest with you.  I know

11    we filed the charges with the State Attorney's Office.

12    Where it is in that process, I don't know.

13    Q.    Do you have any paperwork related to --

14    withdraw the question.

15        Do you have a ticket or some kind of form you

16    fill out when you do the charges?

17    A.    There are probable cause affidavits.

18    Q.    Do you have that with you?

19    A.    Yes.

20    (Whereupon an off-the-record discussion was had.)

21        (Thereupon, Plaintiff's Exhibit Number 6 was

22        marked for Identification.)

23    Q.    (By Mr. Bedard) I have the pages here.  I

24    also have the Notice of Merchant Violation.  You

25    probably have that with you.

1       A.    Which one are we on?

2       Q.    We Buy.

3             MS. YARBROUGH:  So the record is clear, we

4       have marked the We Buy Pawnbroker probable cause

5       affidavit as Plaintiff's Exhibit number 6.

6             MR. BEDARD:  Yes.

7       A.    And yes, I have the merchant violation.

8             MR. BEDARD:  Okay.

9       Q.    (By Mr. Bedard) At the time you went in to

10      this pawnshop, the We Buy Pawnbrokers, was your

11      understanding that We Buy was electronically

12      transferring their data to the Broward Sheriff's

13      Office?

14      A.    Yes, sir.

15      Q.    This is on the record.  In Broward County --

16      for every pawnshop in Broward, is BSO the appropriate

17      law enforcement agency or do the local police

18      departments also collect this data?

19      A.    It's actually a bit of both.  However, the

20      sheriff has ultimate jurisdiction.

21      Q.    Let me ask you, do you have situations -- you

22      collect the information from every pawnshop in Broward,

23      BSO does?

24      A.    No.  Let me explain to you how the process

25      works.

1              Each city that has their own police
2    department out there, by an agreement with us, the
3    police department servicing that area is responsible
4    for picking up the data from the pawnshops and sending
5    it to a single server computer at the Broward Sheriff's
6    Office.

7              We then compile all those records together
8    from however many jurisdictions there are out there,
9    into one central database that all law enforcement
10   officers throughout Broward County can search.

11             The sheriff picks up the information for
12   their 12 city-size districts that they have there so we
13   service our own.  And say the City of Fort Lauderdale
14   picks up their own, but they send their data to our
15   computer.  We then provide them with the information
16   from all over the county.

17        Q.   For example, if there was a gun used in a
18   homicide, and you knew what gun it was, you knew the
19   serial number, and a day later either BSO or Fort
20   Lauderdale or Hollywood could access the county-wide
21   system to see if that gun was pawned with a serial
22   number?

23        A.   Yes.  There is actually, like I said, about a
24   week time delay on the information coming in, because
25   usually it's picked up on a weekly basis, the

1    information, and sent to the database.  But, generally,

2    yes, we can do that.

3         Q.   Going back to We Buy, when you went to the

4    pawnshop on November 30th, you knew at that time that

5    that pawnshop was electronically transferring its data

6    to either BSO or some police department?

7         A.   Yes, sir.

8         Q.   Now at that point you asked them to produce

9    documentation for these items that was listed in

10   Plaintiff's Exhibit 2, and they were not able to?

11        A.   Correct.

12        Q.   Take a look at Section (9) (b) of Section

13   539, starting in the middle.  I think the relevant part

14   is in the middle.

15             It says, "The pawnbroker shall maintain the

16   computer in good working order."  The next sentence,

17   "In the event the pawnbroker transfers pawn

18   transactions electronically, the pawnbroker is not

19   required to also deliver to the appropriate law

20   enforcement official the original or copies of the

21   pawnbroker transaction forms.  The appropriate law

22   enforcement official may, for the purposes of a

23   criminal investigation, request that the pawnbroker

24   produce an original of a transaction form that has been

25   electronically transferred.  The pawnbroker shall

1  deliver this form to the appropriate law enforcement

2  official within 24 hours of the request."

3       A.   Correct.

4       Q.   Did you ever tell anybody at the We Buy

5  Pawnbrokers that they had to produce these forms within

6  24 hours?

7       A.   Yes.

8       Q.   And it's your position that even with this

9  provision of the law, that if they don't provide you

10  with a transaction form immediately, you can still

11  seize the property?

12       A.   You are talking about immediately as in while

13  we are there, and seize it during that same 24 hour

14  period?

15       Q.   No.  Is it your position, as a police

16  officer, you have the right -- withdraw.

17            You agree with me that when you go into a

18  pawnshop, if that pawnshop is electronically

19  transferring data, if you go into a pawnshop and you

20  request a pawnbroker transaction form or to look at

21  pawnbroker transaction forms, you have to give the

22  pawnshop owner 24 hours to produce the form?

23       A.   Before we seize the evidence?

24       Q.   No.  Do you agree with the following

25  proposition:  In the state of Florida when a law

1    enforcement official inspects a pawnshop and wants to

2    review pawnbroker transaction forms, that police

3    officer who does the inspection must provide the

4    pawnshop owner 24 hours in which to produce pawnbroker

5    transaction forms that the police officer wants to

6    inspect.

7             MS. YARBROUGH:   Object to the form.

8       A.   Yes, if they are not being transferred

9    electronically.

10      Q.   (By Mr. Bedard) If We Buy Pawnbrokers was

11   transferring its data electronically, by law they have

12   24 hours in which to produce pawnbroker transaction

13   forms that you wish to inspect, correct?

14      A.   Yes.

15      Q.   Is it your position that, nevertheless, when

16   you do an inspection, if the transaction forms are not

17   given to you immediately, you have a right to then

18   seize all the property that is -- that relates to these

19   pawnbroker transaction forms that were not produced?

20      A.   Yes.  I'm not going to wait 24 hours to

21   collect evidence, yes.

22      Q.   So, at the time you seized the property from

23   We Buy Pawnbrokers -- withdraw the question.

24             The reason you arrested them -- you didn't

25   arrest them, you filled out a probable cause

1    affidavit.

2         A.    Against the corporation.

3         Q.    Against the corporation.

4              It is your position at the time you seized

5    the property on November 30th, that when they did not

6    produce the transaction forms related to that property,

7    at that point in time they were in violation of the

8    law?

9         A.    Yes.

10        Q.    And the reason they were in violation of the

11   law is because you went in, immediately asked them for

12   the forms, they didn't have them, therefore that gave

13   you the right to seize the property?

14             MS. YARBROUGH:    Object to the form.

15        Q.    (By Mr. Bedard) Correct?

16        A.    That makes that property evidence, and

17   therefore it's seizable.

18        Q.    Even though Florida law specifically gives a

19   pawnbroker 24 hours in which to produce these forms to

20   show to a police officer?

21        A.    Not for evidentiary purposes, that's for

22   reviewing the forms.

23        Q.    Let me read to you a sentence.    The

24   appropriate law enforcement official may for the

25   purposes of a criminal investigation request that the

1    pawnbroker produce an original of a transaction form

2    that has been electronically transferred; that you did?

3        A.    Correct.

4        Q.    Then it says the pawnbroker shall give you

5    that form within 24 hours.

6        A.    Correct.

7        Q.    He gives it to you in 12 hours, 18 hours, he

8    hasn't violated the law, has he?

9        A.    No.  You are right, he hasn't.

10       Q.    Despite what it says, once you make the

11   request, if he doesn't give it to you immediately, you

12   can take his property?

13       A.    First of all, I don't know if it's his

14   property, number 1.  And number 2, it is evidence, it

15   is seizable immediately.

16       Q.    So it's your position that this 24-hour

17   waiting period is really -- let's put it this way.

18       A.    If he did not --

19           MS. YARBROUGH:  There is no question.

20       A.    Never mind.  Sorry.

21       Q.    (By Mr. Bedard) Let's go to the Quik Cash.

22   On December 2nd you did an inspection at Quik Cash,

23   which is 2714 West Sunrise Boulevard?

24       A.    Yes, sir.

25       Q.    Who went with you for that?

1       A.    Detective Steinberg and Detective Fraley.

2       Q.    And why did you chose that pawnshop for

3    inspection?

4       A.    Just random choice.

5       Q.    You had not gotten any complaints of them

6    violating the law?

7       A.    Not that I know of.

8       Q.    When you went in there, there was a man by

9    the name of Bruce Nelson working in that pawnshop?

10      A.    Yes.

11      Q.    What did you tell him?

12      A.    Just explained to Mr. Nelson that we were

13   there to conduct an inspection, and he knew Detective

14   Fraley.  Detective Fraley worked that particular area,

15   and I assume that's one of the shops he was responsible

16   for, and we went ahead with our inspection with no

17   objection from Mr. Nelson.

18      Q.    What did you say to him?  What did you do?

19      A.    We just did the same with any inspection

20   regarding pawnshops.  Basically, you are checking to

21   make sure that items have -- you know, that are either

22   out on display or being held in the back room or

23   wherever they may be, have some type of

24   corresponding -- basically a pawn ticket number or

25   merchant number that they assign to their inventory to

1  keep track of it.  So we want to see if that part of

2  the, you know, law had been complied with.

3       Q.   And you looked at all his pending pawns?

4       A.   I don't know if every single one of them were

5  looked at, no, but we looked through them.

6       Q.   Was there anything out of the ordinary about

7  them?

8       A.   I don't remember specifically.  I was dealing

9  with the front display area in that particular store.

10  The other two, Detective Steinberg and Detective

11  Fraley, were behind the counter most of the time.

12       Q.   So you just looked at what was on display?

13       A.   Eventually I made my way behind the counter,

14  but most of the time I was dealing with the front

15  room.

16       Q.   If you will take a look at Exhibit Number 1,

17  which is the property receipt for Quik, Cash.  The

18  property that was seized, we have various jewelry.

19  Where was this property taken from?

20       A.   Some of the jewelry was taken from the front

21  display case, like an up-for-sale type of display

22  case.  I remember most of that was silver.  Of course,

23  I'm not a metallurgist or anything like that, but I

24  assume it was silver.

25            I don't recall if any jewelry or anything for

1    that matter was taken from the safe, but that was

2    Detective Steinberg that looked at the safe.

3              Some of the other items -- there is knives,

4    camera, things like that they were, if I remember

5    correctly, all of these were out for sale on display.

6         Q.   And the reason they were seized was because

7    Mr. Nelson was not able to produce for you any

8    transaction forms or evidence showing that the pawnshop

9    actually owned these items?

10        A.   Right.  He couldn't find them in his computer

11   either.

12        Q.   And he looked?

13        A.   Yes.

14        Q.   And did he go and look in the back for any of

15   the forms that he may have had?

16        A.   I don't recall specifically if he went to

17   look for forms, all his forms are right up front next

18   to the computer.  That part I just don't recall.

19        Q.   So all of these items were then seized?

20        A.   Yes, sir.

21        Q.   Did you ever tell Mr. Nelson that he had 24

22   hours in which to produce the transaction forms under

23   Florida law?

24        A.   I don't know if we actually nailed him down

25   to a 24-hour time frame.  We told him that if -- and

1   the same thing with We Buy -- that, you know, if they

2   found, you know, the transaction forms for these items,

3   the items would be returned to them.

4          Q.   So, at the time you seized these items, Quik

5   Cash Jewelry and Pawn or Mr. Nelson was not in

6   violation of any Florida law, were they?

7          MS. YARBROUGH:   Object to the form.

8          A.   I believe they were, yes.

9          Q.   (By Mr. Bedard) What section?

10         A.   Section -- Chapter 539, Section 8, where it

11  says that anytime a pawnbroker enters into any pawn or

12  purchase transaction, they shall complete a pawnbroker

13  transaction form.  And they did not produce those

14  forms, that's what they were cited for.

15         Q.   You do agree with me, as we went over, that a

16  pawnshop owner who is asked to produce pawnbroker

17  transaction forms under Section 539 has 24 hours to

18  produce the form?

19         MS. YARBROUGH:   Objection, calling for a

20         legal conclusion.  Criminal investigation, not

21         during an inspection.  Calls for a legal

22         conclusion.

23         Q.   (By Mr. Bedard) Did you go into the pawnshop

24  to do an inspection?

25         A.   Yes.

1      Q.    So you were doing an inspection?

2      A.    Right.

3      Q.    So my question is, do you agree with the fact

4   that under Florida law a pawnshop owner has 24 hours in

5   which to produce transaction forms when requested to do

6   so by law enforcement?

7           MS. YARBROUGH:    Object to the form, calls for

8        a legal conclusion.

9      Q.    (By Mr. Bedard) Did you answer?

10      A.    I'm sorry.  I was lost with the objections

11   there for a minute.

12           They have 24 hours to produce the forms, they

13   were not charged with anything, any violation of law,

14   until sometime after that.

15      Q.    But when you seized the property --

16      A.    They are not charged with anything at that

17   time.

18      Q.    That's now my question.  When you seized the

19   property from the --

20      A.    Actually, it was your question, sir.

21      Q.    When you took the property from the pawnshop,

22   from Quik Cash pawnshop, on December 2nd, was

23   Mr. Nelson or Quik Cash in violation of any law?

24      A.    Yes.

25      Q.    Which law?

1     A.    Just explained that.  Chapter 539, Section

2     8.  It says they shall produce the -- shall complete

3     the pawnbroker transaction forms.  When they don't have

4     those, to me that means that they did not comply with

5     that section, those items then become evidence and they

6     are seized.

7     Q.    So it's your position that -- you agree with

8     me that Florida law requires or gives a pawnshop owner

9     24 hours in which to produce pawnbroker transaction

10    forms when requested to do so by a law enforcement

11    officials, correct?

12        MS. YARBROUGH:  He's already answered it.

13        MR. BEDARD:  What's his answer?  Yes? I don't

14        remember.

15        MS. YARBROUGH:  Also calls for a legal

16        conclusion.  The judge is going to decide what 539

17        says, not Sergeant Sileo.

18    Q.    (By Mr. Bedard) Is it your position that if a

19    pawnshop owner does not produce for you pawnbroker

20    transaction forms immediately upon request, that he is

21    violating the law?

22    A.    Depends on the circumstances.

23    Q.    Suppose you go into a pawnshop and say excuse

24    me, sir, could you please produce your pawnbroker

25    transaction forms for me on the following ten items,

1    and he says I'm sorry, I don't have them right now, is

2    that person in violation of the law?

3           MS. YARBROUGH:  Object to the form, improper

4       hypothetical.

5       A.    If he cannot produce the forms or some other

6    type of identifying information as to where those items

7    came from, in my opinion, yes, they are in violation of

8    the law, and those items then become evidence and they

9    are seizable.

10           The fact that they can produce their forms 24

11   hours later, they can produce them without being

12   charged, the evidence is still seizable.

13       Q.    So the 24-hour time frame that the law gives

14   pawnbrokers, what does that mean to you?

15           MS. YARBROUGH:  Object to the form.

16       A.    (No response.)

17       Q.    (By Mr. Bedard) The reason the property from

18   Quik Cash was seized was because Mr. Nelson was not

19   able to provide you with any documentation as to the

20   origin of this property?

21       A.    Yes.

22       Q.    So, for all the property at Quik Cash at the

23   time that you took it, did you have any evidence or any

24   reason to believe that any of that property was stolen?

25       A.    No.

1        Q.    Did you have any reason to believe that any

2   of that property was misappropriated?

3        A.    No.

4        Q.    Did you have any evidence to believe that

5   that property was not owned by Quik Cash or by

6   Mr. Nelson?

7        A.    I have no idea of that.

8        Q.    And the same applies to the property at We

9   Buy Pawnbrokers which was seized on November 30th.

10            When you took the property, when the property

11  was seized from the pawnshop, at the time it was

12  seized, did you have any reason to believe that any of

13  the property you seized was stolen?

14       A.    Excepting the handgun, because I'm not sure

15  when we found out about that.  Excepting that, no.

16       Q.    Did you have any reason to suspect, to

17  believe or any evidence, whatsoever, that the property

18  taken from We Buy Pawnbrokers was misappropriated other

19  than the handgun?

20       A.    No.

21       Q.    Did you have any reason to believe that the

22  property you took from We Buy Pawnbrokers was not owned

23  by We Buy Pawnbrokers, except for the gun?

24       A.    No.

25       Q.    Okay.  December 2nd you went into Citi-Pawn

1  and did an inspection there, you and Detective

2  Steinberg?

3          MS. YARBROUGH:  I'm going to object to

4      Citi-Pawn because they are not at issue in this

5      case.

6          MR. BEDARD:  I want to show if there is some

7      kind of policy.

8          MS. YARBROUGH: I'm going to object and ask

9      him not to answer.  This has nothing to do with

10     this lawsuit, and you already advised me Citi-Pawn

11     is preparing to file a lawsuit.  So any questions

12     about Citi-Pawn I will object to and instruct him

13     not to answer.

14         If you want to ask him general policy

15     questions relating to searches of all pawn shops,

16     that's fine, but you are not going to ask him --

17     I'm not going to have him discuss that lawsuit.

18         MR. BEDARD:  I will just put on the record, I

19     wish to ask Detective Sileo questions about the

20     search that was done at Citi-Pawn on December 2nd,

21     which was one of the pawnshops that was searched.

22     I think it's relevant to show policy.  I think

23     it's relevant to all the issues in this case.  If

24     he's not going to answer, he's not going to

25     answer.

1      MS. YARBROUGH:  I will just put my objection

2   on record that this is an effort by Citi-Pawn, as

3   a fourth and separate lawsuit, that I have been

4   advised is being filed against the sheriff, to

5   conduct discovery before the sheriff has been

6   properly served with that lawsuit.  Until he's

7   been served with that lawsuit, he is under no

8   obligation to discuss anything at Citi-Pawn.

9      But certainly the sheriff has no objection

10   regarding his policies or procedures relating to

11   searches of all pawn shops.  The plaintiff is

12   clearly entitled to ask those questions.

13   Q.   (By Mr. Bedard) After these searches were

14   completed, there was an article in the newspaper?

15   A.   Yeah, a few days later.

16   Q.   Whose idea was it to put all this property

17   out on display for the public to come view?

18   A.   I don't recall exactly, but I believe it was

19   my captain.

20   Q.   And what is his name?

21   A.   Tony Fantigrassi.  T-O-N-Y

22   F-A-N-T-I-G-R-A-S-S-I.  Gosh, I hope I got that right.

23   Q.   Tony Fantigrassi.

24   A.   I don't know specifically whether it was him

25   or not, but I think it was.

1      Q.   And why was it put out on display?

2      A.   So that we could ask the media -- because it

3  was kind of a quick time frame turnaround type thing,

4  we were asking the media to get the word out to maybe

5  some potential victims to come take a look at the

6  property to see if anybody recognized anything, to see

7  if anybody wanted to claim something as being theirs.

8      Q.   All of the property that was taken from these

9  two pawnshops was put out for public display?

10     A.   Yes, sir.

11     Q.   And anybody could come in and examine the

12 property?

13     A.   Yes, sir.

14     Q.   Did you give any of the property back to any

15 of the victims?

16     A.   No, sir.

17     Q.   Did any of the victims claim the property?

18     A.   Yes.

19     Q.   What has happened since to that property that

20 has been claimed?

21     A.   To my knowledge, nothing.  It is still

22 sitting there in our evidence storage until court

23 disposition takes place.

24     Q.   Did you place a hold order on any of that

25 property?

1       A.   No.  It's still held in evidence.

2       Q.   So you have property that was taken from a

3  pawnshop that you now have reason to believe it is

4  misappropriated?

5       A.   We have people that claim that it has been,

6  yes.

7       Q.   You have not placed a hold order on any of

8  that property?

9       A.   No.

10      Q.   It's your position that you don't have to?

11      A.   Correct.

12      MR. BEDARD:  I have nothing further other

13      than I guess I will have to make a motion dealing

14      with Citi-Pawn.

15      MS. YARBROUGH:  If you want to proffer what

16      your questions are.

17      MR. BEDARD:  I'm going to ask him the same

18      questions as I did about the other pawnshops.

19      MS. YARBROUGH:  Are you going to ask him

20      about what he did during his inspection at

21      Citi-Pawn?

22      MR. BEDARD:  Yes.

23      MS. YARBROUGH: I am going to object to that

24      because that's discovery in a lawsuit of

25      Citi-Pawn.  That's premature

1          THE REPORTER:  Waive reading and signing?

2          MS. YARBROUGH:  Reading, please.

3          (Whereupon an off-the-record discussion was

4     had.)

5          MS. YARBROUGH:  We are on the record to

6     straighten out what the exhibit numbers are.

7          Plaintiff's 1 is the Quik Cash property

8     receipts.

9          Plaintiff's 2 is the We Buy property

10    receipts, which also has the probable cause

11    affidavit and the Notice of Merchant Violation

12    attached.

13         We also labeled the We Buy Pawnbrokers PCA as

14    Plaintiff's Exhibit Number 6 when you were talking

15    about it.  So the PCA, you referred to it as 6, so

16    the We Buy PCA was referred to as 6, but it is

17    also incorporated in Exhibit 2.

18         MR. BEDARD:  I'm going to use the same

19    exhibits with the next witness.

20         MS. YARBROUGH:  And you do not have a copy of

21    the Quik Cash probable cause, but it's not in

22    here, so you didn't refer to it all.

23         MR. BEDARD:  Okay.  Thanks.

24         THE REPORTER: May I have your name, sir?

25         THE WITNESS: Edward Sileo, S-I-L-E-O.

1          (Thereupon, the deposition was concluded at

2     12:30 p.m.)

3                    ------------------

4

5

6

7          _____

8                    SGT. EDWARD SILEO

9

10

11         SWORN AND SUBSCRIBED before me, this

12     _____ day of _____, 2000, in the

13     County of _____, State of Florida.

14

15

16

17         _____

18                    NOTARY PUBLIC

19

20

21         My Commission expires:

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA        )
                                      ss.
COUNTY OF BROWARD        )

    I, the undersigned authority, certify that
_Sgt. Edward Sirro_____ personally appeared
before me and was duly sworn.

    WITNESS my hand and official seal this _7th__
day of _September__, 2000.

            _Shela K Ellis_____

            SHELA K. ELLIS, RPR and
            Notary Public in and for the
            State of Florida at Large.
            Expires:  November 16, 2003
            COMMISSION NO. CC882986

SHELA K. ELLIS
MY COMMISSION # CC 882986
EXPIRES: Nov 16, 2003
1-800-3-NOTARY  Fla. Notary Service & Bonding Co.

2

```
  1                        CERTIFICATE

  2   STATE OF FLORIDA    )
                          ) ss.
  3   COUNTY OF BROWARD   )

  4        I, SHELA K. ELLIS, R.P.R., do hereby certify
      that pursuant to Notice of Taking Deposition in the
  5   above-styled cause, that I was authorized to and did
      stenographically report the foregoing deposition as
  6   hereinabove shown, and the testimony of said witness
      was reduced to computer transcription under my
  7   personal supervision.

  8        I further certify that the said deposition was
      taken at the time and place specified hereinabove,
  9   and that I am neither of counsel nor solicitor to
      either of the parties in said suit nor interested in
 10   the event of the cause.

 11        I further certify that I have delivered the
      original copy of said deposition to
 12   ___Mr. Dennis R. Bedard___, Esquire, to be retained by
      him/her pending further order of the Court.

 13

 14        WITNESS my hand and official seal in the City of
      Fort Lauderdale, County of Broward, State of Florida,
      this ___7th___ day of ___September___, 2000.

 15

 16                        ___Shela K. Ellis___

 17                        SHELA K. ELLIS, RPR

 18

 19

 20

 21

 22

 23

 24

 25
```

**ESQUIRE REPORTING SERVICES**
1218 Southeast 3rd Avenue
Fort Lauderdale, Florida 33301
(954) 463-9506

September 1, 2000

**COPY**

SGT. EDWARD SILEO
c/o Ms. Alexis Yarbrough
Purdy, Jolly & Giuffreda
1322 S.E. 3rd Avenue
Fort Lauderdale, Florida  33316

RE:   SKG CORP., d/b/a WE BUY
      PAWNBROKERS, a Florida corporation
      v. KEN JENNE, SHERIFF OF BROWARD COUNTY
      CASE NO: 00-06012-CIV-MIDDLEBROOKS

Dear Sgt. Sileo:

Your deposition which was taken in the above-styled
cause on August 23, 2000, is now ready for reading and
signing.

You may come to our office at any time between the
hours of 9:00 a.m. and 5:00 Monday through Friday and
read and sign your deposition.  If for any reason you
wish to waive this right, or you wish not to read and
sign your deposition, please so advise.

Your deposition transcript will be held in this office
until October 1, 2000, after which time it will be
delivered to Mr. Dennis R. Bedard, Esquire, to be
retained by him pending further order of the Court.

Sincerely,


Shela K. Ellis,
RPR and Notary Public,
State of Florida at Large.
ESQUIRE REPORTING SERVICES


cc:  Bedard, Yarbrough