1           IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA

2
                           CASE NO:  00-06012-CIV-
3                          MIDDLEBROOKS
                           MAGISTRATE BANDSTRA

4    SKG CORP., d/b/a We Buy
     PAWNBROKERS, a Florida
5    corporation,                    **COPY**

6           Plaintiff,

7    vs.

8    KEN JENNE, SHERIFF OF
     BROWARD COUNTY,

9
            Defendant.
10   _____/

11   QUIK CASH PAWN & JEWELRY,
     INC., a Florida corporation,
12
            Plaintiff,
13   vs.                             CASE NO. 99-7630-CIV-
                                     MIDDLEBROOKS
14   KEN JENNE, SHERIFF OF           MAGISTRATE BANDSTRA
     BROWARD COUNTY,
15
            Defendant.
16   _____/

17                       FORT LAUDERDALE, FLORIDA
                         August 23, 2000
18                       2:00 p.m.

19
                         --------------------
20
                         DEPOSITION
21
                         OF
22
                         JOEL STEINBERG
23

24

25

FILED by _____ D.C.
DKTG

SEP 2 9 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

ESQUIRE DEPOSITION SERVICES
1218 Southeast 3rd Avenue
Fort Lauderdale, Florida 33316
(954) 463-9506

September 1, 2000

JOEL STEINBERG                          **COPY**
c/o Purdy, Jolly & Giuffreda
1322 Southeast Third Avenue
Fort Lauderdale, Florida 33316
RE:   SKG, et al. V. KEN JENNE, et al.
      CASE NO: 00-6012-CIV

Dear Deputy Steinberg:

Your deposition which was taken in the above-styled cause on August 23, 2000, is now ready for reading and signing.

You may come to our office at any time between the hours of 9:00 a.m. and 5:00 Monday through Friday and read and sign your deposition.  If for any reason you wish to waive this right, or you wish not to read and sign your deposition, please so advise.

Your deposition transcript will be held in this office until October 1, 2000, after which time it will be delivered to Dennis R. Bedard, Esquire, to be retained by him pending further order of the Court.

Sincerely,


Shela K. Ellis,
RPR and Notary Public,
State of Florida at Large.
ESQUIRE DEPOSITION SERVICES


cc:  Bedard, Yarbrough

```
 1        A.    (17) (b).

 2        Q.    Okay.  So you are saying that somebody --

 3   they failed to complete a pawnbroker transaction form

 4   for each transaction that's listed in the property

 5   receipt?

 6        A.    Correct.

 7        Q.    But you went there -- it's not that they

 8   didn't do it, they just couldn't find them.

 9             MS. YARBROUGH:  Object to the form.

10        Q.    (By Mr. Bedard) Let me ask you, is it your

11   position for personal property, if you bring your

12   personal property into a pawnshop, you have to complete

13   a pawnbroker transaction form for it?

14             MS. YARBROUGH:  Object to the form.

15        A.    I didn't say that.

16        Q.    (By Mr. Bedard) What provision of the law did

17   We Buy Pawnbrokers violate by having a personal

18   computer and a personal weapon in a pawnshop?

19             MS. YARBROUGH:  Object to the form.

20        Q.    (By Mr. Bedard) You told me it was (8) (a),

21   and if it was (8) (a), then you have to be saying that

22   you require a transaction form be filled out every time

23   personal property is brought into a pawnshop.

24             MS. YARBROUGH:  Object to the form and

25        mischaracterizes his testimony.
```

1          A.    It's true, because I said it is discretionary

2    before.

3          Q.    (By Mr. Bedard) But in this case you seized

4    Mr. Goldstein's personal computer and you seized his

5    weapon.

6               MS. YARBROUGH:    Assumption of facts not in

7    evidence.

8          Q.    (By Mr. Bedard) Was the weapon and was the

9    computer seized?

10         A.    Yes.

11         Q.    What provision of law was We Buy Pawnbrokers

12    in violation of that gave you reason to take that

13    computer and that gun?

14         A.    I'm trying to think of a way to word it.

15    Because it's the same instance if I stopped and would

16    write somebody a traffic ticket and they tell me I was

17    not speeding.

18         Q.    You are saying they did speed.  I'm asking

19    you what provision of law?

20         A.    He can say it it's his and I can say it's not

21    documented.

22         Q.    How do you know these sun glasses are mine?

23    How do you know this phone is mine?  Can you come up

24    with documentation that you own these items?

25               MS. YARBROUGH:    Object to the form,

1      argumentative.

2          A.    You are not a regulated business like he's

3      operating.

4              MR. BEDARD:    Going to make a lawyer joke.

5              (Whereupon an off the record discussion was

6          had.)

7          Q.    (By Mr. Bedard) The question is you seized We

8      Buy Pawnbrokers' -- Mr. Goldstein's personal computer

9      and his gun.  What provision of Section 539 of Florida

10     law was being violated that caused you to seize those

11     two items?

12             MS. YARBROUGH:    Object to the form.  Assumes

13     facts not in evidence.  Nobody has established that it

14     was their personal property.  You can answer.

15         A.    No documentation.

16         Q.    (By Mr. Bedard) So, therefore, it's your

17     position that when a pawnshop owner brings his personal

18     property into a pawnshop, be it a weapon, a knife, a

19     set of keys, he has to fill out a pawnbroker

20     transaction form for that?

21             MS. YARBROUGH:    Object to the form.

22         A.    Like I said before, again, discretionary.

23         Q.    (By Mr. Bedard) Obviously in this case it

24     wasn't because you seized the property, and what

25     violation of Section 539 did he violate that made you

1    or required you to seize that property?

2              MS. YARBROUGH:  Hold on.  Hold on.  I'm going

3         to object.  Asked and answered.  He testified

4         earlier pursuant to Section 539 (8) (a).  It has

5         been answered, and you have asked him four times.

6         Now, I'm going to instruct him not to answer.

7              MR. BEDARD:  Okay.  If that's his answer.

8         Q.   (By Mr. Bedard) When a pawnbroker brings his

9    personal property into his own business he must fill

10   out a pawnbroker transaction form for each item of

11   personal property that he has in the pawnshop?

12             MS. YARBROUGH:  Object to the form.

13        A.   We have gone through this one before.

14        Q.   (By Mr. Bedard) Answer yes or no.

15        A.   I'm not even going to bother.

16        Q.   That question has not been answered.  That

17   has not been answered.  It's either a yes or a no.  You

18   are not going to answer?

19        A.   Move on.

20             MR. BEDARD:  All right.  I will make a motion

21        to compel.

22             MS. YARBROUGH:  Calls for a legal

23        conclusion.

24        Q.   (By Mr. Bedard) Let's go to the next one

25   which was December 2nd, Quik Cash.  You went there with

1    Detective Sileo?

2        A.    Yes.

3        Q.    Was there another detective involved.

4    Fralley (phonetic)?

5        A.    Yes.

6        Q.    You went there on December 2nd, looking at

7    Exhibit 1, this is all the property that was seized?

8        A.    Yes.

9        Q.    When you went in the pawnshop there was a

10   gentleman by the name of Bruce Nelson who worked there?

11       A.    Yes.

12       Q.    Did you have a conversation with him?

13       A.    I'm sure at some point in time while I was

14   there we did.

15       Q.    Do you recall what you said to him?

16       A.    No, I do not.

17       Q.    Did you ever ask him to produce transaction

18   forms or some kind of evidence of ownership of the

19   items that you seized?

20       A.    Yes, we did numerous times.

21       Q.    What did he say?

22       A.    He tried to be very cooperative and helpful

23   and look the stuff up in a computer.

24       Q.    And was he able to?

25       A.    Some items yes.  Other items no.

1      Q.   Did he say where the transaction forms were,

2  if they existed?

3      A.   I can't recall what he said about the forms,

4  no.

5      Q.   Did you tell him he had 24 hours in which to

6  produce the forms?

7      A.   I can't recall if I did or not, no.

8      Q.   Then you seized all the items that he could

9  not give you paperwork on, correct?

10      A.   Correct.

11      Q.   At the time you seized the items did you have

12  any reason to believe that any of that property you

13  seized was misappropriated?

14      A.   No.

15      Q.   Did you have any reason to believe that it

16  was owned by someone other than Quik Cash?

17      A.   No, other than one piece that just had a

18  label, it was improperly defaced.

19      Q.   Where is that property now that was seized

20  from Quik Cash?

21      A.   In the evidence warehouse.

22      Q.   And the same thing with We Buy Pawnbrokers,

23  is it still there?

24      A.   As far as I'm aware, we didn't release any of

25  it, and that's where I left it.  I'm sorry, we did

1    release some of Quik Cash's.

2        Q.    Why?

3        A.    They finally did supply transaction forms,

4    and that stuff was returned to them.

5        Q.    Did they provide it the next day?

6        A.    No, it was several days or weeks later.

7        Q.    Is there any reason why no criminal charges

8    have been filed against Quik Cash?

9        A.    I would like to know myself.  I filled out

10   all the appropriate forms and turned them into the West

11   Satellite Courthouse.  They did file on one of the

12   other shops.

13       Q.    Which was Citi-Pawn?

14       A.    They are just whining about how many charges

15   they have to type in on these.

16       Q.    The same thing with We Buy, you don't know?

17       A.    No.  I have been there several times to ask

18   them, and they say we are busy.  We are busy.

19       Q.    So the sheriff is going to keep possession of

20   the property until when?

21       A.    Until the disposition of the cases.

22       Q.    Have you ever gone to the State Attorney to

23   find out if they are going to file or not, because it's

24   been almost a year?

25       A.    I have been there several times.

1    Q.    You talk to a different person every time?

2    A.    Actually got the same one twice.

3    Q.    Somebody must be doing a good job.

4          MR. BEDARD: I have no further questions.

5          MS. YARBROUGH:  I don't have any either.  He

6    will read.

7          THE REPORTER: Do you want a copy if these are

8    typed?

9          MS. YARBROUGH: Yes, ma'am.

10         MR. BEDARD: Yeah.

11         (Thereupon, the deposition was concluded at

12   2:50 p.m.)

13                    ------------------

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4
_____

5                   JOEL STEINBERG

6

7

8          SWORN AND SUBSCRIBED before me, this

9 _____ day of _____, 2000, in the County

10 of _____, State of Florida.

11

12

13

14
_____

15                   NOTARY PUBLIC

16

17

18          My Commission expires:

19

20

21

22

23

24

25

# CERTIFICATE OF OATH

STATE OF FLORIDA      )
                               ss.
COUNTY OF BROWARD      )


    I, the undersigned authority, certify that
_____ _Joel Steinberg_ _____ personally appeared
before me and was duly sworn.

    WITNESS my hand and official seal this ___7th___
day of _September_, 2000.


                    _Shela K Ellis_ _____

                    SHELA K. ELLIS, RPR and
                    Notary Public in and for the
                    State of Florida at Large.
                    Expires:  November 16, 2003
                    COMMISSION NO. CC882986


SHELA K. ELLIS
MY COMMISSION # CC 882986
EXPIRES: Nov 16, 2003
1-800-3-NOTARY  Fla Notary Service & Bonding Inc.

2

```
1                         CERTIFICATE

2    STATE OF FLORIDA   )
                        ) ss.
3    COUNTY OF BROWARD  )

4         I, SHELA K. ELLIS, R.P.R., do hereby certify
     that pursuant to Notice of Taking Deposition in the
5    above-styled cause, that I was authorized to and did
     stenographically report the foregoing deposition as
6    hereinabove shown, and the testimony of said witness
     was reduced to computer transcription under my
7    personal supervision.

8         I further certify that the said deposition was
     taken at the time and place specified hereinabove,
9    and that I am neither of counsel nor solicitor to
     either of the parties in said suit nor interested in
10   the event of the cause.

11        I further certify that I have delivered the
     original copy of said deposition to
12   Dennis R. Bedard , Esquire, to be retained by
     him/her pending further order of the Court.

13

14        WITNESS my hand and official seal in the City of
     Fort Lauderdale, County of Broward, State of Florida,
15   this   7th   day of September , 2000.

16
                    SHELA K. ELLIS, RPR
17

18

19

20

21

22

23

24

25
```

1

2   APPEARANCES:

3        LAW OFFICE OF DENNIS R. BEDARD
         By: DENNIS R. BEDARD, ESQUIRE,
4        Appearing on behalf of the Plaintiffs.

5        PURDY, JOLLY & GIUFFREDA
         By: ALEXIS YARBROUGH, ESQUIRE,
6        Appearing on behalf of the Defendant.

7
                        I N D E X
8

9   WITNESS                                PAGE

10  JOEL STEINBERG

11  Direct Examination by Mr. Bedard          3

12

13                  E X H I B I T S

14
    Plaintiff's Number 7 for Identification      6
15

16

17

18

19

20

21

22

23

24

25

1          Deposition of JOEL STEINBERG, a Witness

2    herein, taken pursuant to the Rules and Notice

3    heretofore filed before Shela K. Ellis, R.P.R., and

4    Notary Public, State of Florida at Large, at 1218

5    Southeast 3rd Avenue, Fort Lauderdale, Broward County,

6    Florida, on August 23, 2000, commencing at or about

7    2:00 p.m.

8                   --------------------

9

10   THEREUPON:

11                   JOEL STEINBERG

12   a Witness herein, appearing at the instance of the

13   Plaintiffs and, having been first duly sworn by the

14   court reporter and cautioned to tell the truth of his

15   knowledge as to the within matters, was thereupon

16   examined and testified upon his oath as follows:

17                   DIRECT EXAMINATION

18   BY MR. BEDARD:

19       Q.    State your name, please.

20       A.    Joel Steinberg.

21       Q.    Where are you employed?

22       A.    Broward Sheriff's Office.

23       Q.    How long have you been employed there?

24       A.    Fifteen-and-a-half years.

25       Q.    Did you have any law enforcement experience

1   before that?

2       A.    No.

3       Q.    Where are you currently assigned?

4       A.    Officially assigned to District 9,

5   unincorporated Pompano Beach.

6       Q.    Have you ever been -- have you had any

7   training by the Broward Sheriff's Office in regard to

8   conducting inspections of pawnshops?

9       A.    Yes.

10      Q.    What training have you had?

11      A.    Actually Sergeant Sileo and myself put on a

12  training seminar based on the information that is in

13  the booklet here and it's also here.

14      Q.    It was in August of 1989 (sic)?

15      A.    It was August of '99.

16      Q.    Who was that seminar in front of or who was

17  it given to?

18      A.    The district representatives.

19      Q.    How many people were at the seminar?

20      A.    Ballpark, six, seven maybe.

21      Q.    These were representatives from the various

22  BSO districts?

23      A.    Some of them, not all of them.

24      Q.    Prior to giving this seminar have you had any

25  training in conducting pawnshop inspections?

1          A.    Through FLEPRU.  F-L-E-P-R-U.  Acronym for

2     Florida Law Enforcement Property Recovery Unit.

3          Q.    Have you received training in how to conduct

4     an inspection of pawnshops at these FLEPRU conferences

5     or meetings?

6          A.    Yes, they could have some.

7          Q.    Have you ever received any training or

8     attended any lectures in regards to Section 539,

9     Florida Statutes?

10         A.    The FLEPRU Conference covered those.

11         Q.    Do you consider yourself familiar with

12    Section 539?

13         A.    Yes.

14         Q.    Directing your attention to August of '99,

15    when you and Sergeant Sileo -- are you an officer,

16    Sergeant?

17         A.    No, deputy, detective.

18         Q.    When you and Sergeant Sileo gave the seminar

19    in August 1999, what topics did you cover?

20         A.    The most important thing we were were trying

21    to explain was a new collection and transfer method

22    that was developed for the electronic reporting and the

23    electronic collection of the data from the shops.

24         Q.    Did you also explain to these people what the

25    requirements of reporting are under Section 539?

1          A.    I myself, no.

2          Q.    Do you know if Sergeant Sileo did?

3          A.    He could have, I don't know exactly if he did

4    or not.

5          Q.    How long did the seminar last?

6          A.    I don't know, a few hours.

7          Q.    It was sort of a meeting to instruct the

8    district representatives about the new system you were

9    putting into effect?

10         A.    Correct.  The new transfer procedures.

11         Q.    I have in front of me a document which is

12   Plaintiff's Exhibit number 7, which is the PawnTrac

13   Training User Manual put out by the Broward Sheriff's

14   Office.  Do you recognize that?

15              (Thereupon, Plaintiff's Exhibit Number 7 was

16        marked for Identification.)

17         A.    Yes, I do.

18         Q.    (By Mr. Bedard) Who wrote it?

19         A.    Most of it was authored by Sergeant Sileo, I

20   also had some in here also.

21         Q.    There was also at the bottom of the second or

22   third page where he gives thanks to you and another

23   detective or -- Officer Montgomery?

24         A.    Correct.

25         Q.    What was the purpose in writing that manual?

1    A.    So that the users knew how to collect the

2    data, how to transfer the data, how to make sure the

3    data was there, and giving them certain guidelines when

4    they need to go in a shop and inspect.

5    Q.    Okay.  Looking at the inside of that it says

6    Pawnshop Program and Pawnshop Inspection, you have also

7    in front of you Plaintiff's Exhibit 4, at the top is

8    the sheriff's logo with Sheriff Ken Jenne's name on it,

9    correct?

10    A.    Yes.

11    Q.    There is also a one-page Inspection

12    Guidelines?

13    A.    Correct.

14    Q.    There is a Pawnshop Inspection Checklist?

15    A.    Correct.

16    Q.    And Pawnshop Notice of Merchant Violation and

17    a page with addresses on it.

18         Now, these documents in front of you, which

19    is Exhibit 4, also part of Plaintiff's Exhibit 7, these

20    are documents that were written and published by the

21    Sheriff's Office, correct?

22    A.    Yes.

23    Q.    Even though Sergeant Sileo authored them,

24    he's doing this and putting this out as part of his

25    employment duties with the Broward County Sheriff's

1    Office?

2         MS. YARBROUGH:  Object to the form.

3         MR. BEDARD: You still have to answer.

4    A.    Yes.

5    Q.    (By Mr. Bedard) And as you can see, on each

6    of these documents the sheriff's logo is clearly

7    imprinted and Sheriff Jenne's name is, of course,

8    prominently displayed.  Each one of these has the logo,

9    correct?

10   A.    Except for the one with the address and phone

11   numbers.

12   Q.    Do these documents and what's in them

13   represent the policy of the Broward Sheriff's Office?

14   A.    There is --

15        MS. YARBROUGH:  Object to the form.  You can

16        answer.

17   A.    There is no written policy on it, it's a

18   guideline they can work under.  It's a very particular

19   field, and some of them were general investigators that

20   got assigned to pawn shops, so they could have a

21   guideline as to what they could do.  It was a

22   guideline.

23   Q.    (By Mr. Bedard) This Plaintiff's Exhibit 4,

24   these are guidelines to help members of the Broward

25   Sheriff's Office in conducting inspections of

1  pawnshops?

2       A.    Yes.

3       Q.    And they offer advice and instruction as to

4  how to conduct an inspection, correct?

5       A.    Yes.

6       Q.    They offer instruction as to what legally a

7  police officer can do when conducting an inspection and

8  what a police officer cannot do?

9       A.    Without going into great detail through the

10 whole thing, yes.

11      Q.    I understand.  If for example, if you look at

12 -- on the Pawnshop Inspection Checklist, the second

13 page, if you look at the fourth one which says all

14 items -- it's the one I'm looking at.  Is that the

15 one?  Yeah, second page.  The next page.  Flip the

16 page.  There it is.  Right there.

17           It says:  All items in the store must be

18 accounted for.  And I'm not going to read it, but that

19 paragraph -- if a deputy sheriff inspected a pawnshop

20 in conformance with what is stated in that paragraph,

21 you would agree that they would be following the policy

22 that is set out by the sheriff, correct?

23           MS. YARBROUGH:  Object to the form.

24      A.    Yeah, I don't understand what you are getting

25 at there.

1      Q.    (By Mr. Bedard) It says some pawnbroker's

2   keep personal items in their store, this is fine so

3   long as they have it separate from the pawned

4   merchandise, not displayed together.  However, personal

5   or not, every item in the store must have some proof of

6   origin.  Whether it's from a permitted vendor or pawned

7   transaction form, every item must be accounted for.

8      A.    And your question again?

9      Q.    My question is if an officer went into a

10   pawnshop and cited a pawnshop because every item in the

11   store was not accounted for, he would be doing that

12   pursuant to the instructions contained in this

13   document, correct?

14      A.    And the referenced statute sections.

15      Q.    Correct.  Assuming that those statutes

16   actually say what the words -- assuming that

17   interpretation is correct.

18          Now, if you go to the bottom where it says

19   hold orders, there is a provision that states the

20   following:  You cannot force a pawnbroker to give a

21   victim back their property, you can take the property

22   into evidence listing the pawnbroker as the owner or

23   co-owner of the property.

24          And if the pawnshop owner -- if a police

25   officer followed that position he would be following

1    one of the major instructions as set forth by the

2    Broward Sheriff's Office, and he would be following

3    state law, assuming that this interpretation of the

4    state law is correct?

5        A.    Under hold orders?

6        Q.    Yes.

7        A.    Yes.

8        Q.    Now, let's look at the next page which is the

9    Pawnshop Inspection Checklist.  The actual checklist.

10   If you look near the bottom, the middle.  All items in

11   the store must be accounted for.

12            Now, what you have here is a checklist, and I

13   take it the reason the way this checklist is used is

14   that this is for the police officer to use when he's

15   doing the inspection, as he goes through each item he

16   checks off whether this provision has been complied

17   with by the pawnbroker, correct?

18       A.    How others use it, I don't know.

19       Q.    Why don't you tell me how it's supposed to be

20   used.

21       A.    It's something they can use for a guideline

22   as to what is necessitated on the forms for the

23   particular items.

24       Q.    One of the items that they can check off says

25   the following:  All items in the store must be

```
 1    accounted for.  Some pawnbrokers keep personal items in
 2    their stores, this is fine so long as they have it
 3    separate from the pawned merchandise and not displayed
 4    together.  However, personal or not, every item in the
 5    store must have some proof of origin.
 6              Now, am I correct in saying that the Broward
 7    Sheriff's Office interpretation of Section 539 is that
 8    every piece of property in a pawnshop -- for every
 9    piece of property in a pawnshop, the pawnshop owner
10    legally has to provide proof of ownership?
11              MS. YARBROUGH:  I will object to the form.
12         This witness can testify to personal knowledge but
13         he has not been subpoenaed as a person with the
14         most knowledge regarding policies, so to the
15         extent his answer will be his own personal
16         knowledge.
17         A.   I can't say what the agency says about it,
18    but I look at it that they need to have proper
19    documentation.
20         Q.   (By Mr. Bedard) As a detective, it's your
21    opinion that a pawnshop owner has to prove or provide a
22    law enforcement officer with proof of ownership that he
23    owns every single item in his pawnshop?
24         A.   Yes.
25         Q.   And is that the policy or is that the
```

1     interpretation that has been adopted by the Broward

2     County Sheriff's Office?

3          A.    I can't say what the rest of them have

4     adopted, no.

5          Q.    You have in front of you an interpretation of

6     the statute that says every item in a pawnshop the

7     pawnshop owner must provide proof of origin, correct?

8          A.    Yes.

9          Q.    What's the logo?  It says Sheriff Ken Jenne,

10    has a picture of a badge; is that correct?

11         A.    That's correct.

12         Q.    Is it safe to assume that's the policy of the

13    Sheriff's Office?

14              MS. YARBROUGH:  Let me object to the form.

15         When you say policy, they think of the policies

16         and procedures.  If you want to say guideline,

17         because to him -- it's all the same thing for us

18         legally, but that may help clarify it for him.

19         A.    We also have many policies that certain

20    individuals do not follow so others might not follow

21    this even if it is a policy.

22         Q.    (By Mr. Bedard) How many pawnshop inspections

23    have you done?

24         A.    If you count the three or so years that I was

25    in there --

14

1      Q.   Within 50.

2      A.   I couldn't even get you within 50.  If you

3  want to go through all the things I did each week going

4  through eight to ten pawnshops, it was quite a few.

5           Is it safe to say you probably would have

6  done about 500 to a thousand?

7      A.   Possibly.

8      Q.   Have you ever issued a hold order on

9  property?

10     A.   Yes, I have.

11     Q.   Under what circumstances have you issued hold

12 orders?

13     A.   When it has been identified as stolen.

14     Q.   It's your understanding if you find stolen

15 property in a pawnshop you can issue a hold order on

16 the property?

17     A.   Yes.

18     Q.   And what happens, do you then have a right,

19 if you want, to take the property with you?

20     A.   Yes, we can receipt it into evidence and hold

21 it there also.

22     Q.   And Section 539 specifically allows you to do

23 that?

24     A.   Yes.

25     Q.   Take it into evidence?

```
 1        A.   Yes.

 2        Q.   But the property must be misappropriated in

 3   order for you to take it into evidence?

 4        A.   No.

 5        Q.   What are the other circumstances under which

 6   you can take it into evidence?

 7        A.   Any other crimes that it might have been

 8   involved with.  Criminal acts.

 9        Q.   Even if it's -- if the property is other than

10   misappropriated?

11        A.   Any piece of property could be collected as

12   evidence.

13        Q.   If it's in your possession you have to issue

14   a hold on it?

15        A.   No.  If I have it why would I issue a hold

16   order.

17        Q.   So it's your position that you can seize

18   property from a pawnshop outside of the provisions of

19   Section 539, meaning Section 539 does not provide you

20   with the exclusive means by which you can seize

21   property from pawnshops?

22        A.   Could you restate your question?

23        Q.   Is it your position or opinion that Section

24   539 is not the exclusive -- does not provide the

25   exclusive means by which property can be seized inside
```

1    a pawnshop?

2         A.    From looking at this, correct.

3         Q.    Reading 539, I think you would agree with me

4    that I think the only -- the only means in 539 by which

5    law enforcement can seize property with inside a

6    pawnshop is with a hold order?

7              MS. YARBROUGH:  Object to the form.  Asking

8         for a legal conclusion.  You can answer.

9         A.    You said the only way we can do it through

10   539 is through a hold order?

11        Q.    (By Mr. Bedard) Yes.  That's all that is

12   provided for in Section 539?

13        A.    It looks like you could seize it without the

14   hold order also, depending on what time frame.

15        Q.    Where is that?

16        A.    Go to Section (16) number (2).  While a hold

17   order is in effect, if I seize it instead of placing a

18   hold order, if it's misappropriated then I have seized

19   it as opposed to holding it first, so it wouldn't have

20   a hold order in effect there.

21             If I identified it as misappropriated and

22   needed it for the investigation, as opposed to leaving

23   it in the shop with a hold order and just seize it and

24   use it for the investigation, I wouldn't have had a

25   hold order on it, I would have just seized it as

1    evidence.

2        Q.   So at that point you would not have had a

3    hold order?

4        A.   If I needed it I would have seized it at that

5    point.

6        Q.   Look at Section 2, the hold order.  Section

7    (16), Section 2.  It says while a hold order is in

8    effect, the pawnbroker must upon request release the

9    property subject to the hold order to the custody of

10   the appropriate law enforcement official for use in a

11   criminal investigation.

12            Even if you put a hold order on the property,

13   if you request that it be turned over to you, the

14   pawnshop owner has to give it to you for your use if

15   there is a criminal investigation, correct?

16       A.   Correct.

17       Q.   It's still your position if you find property

18   that is misappropriated you can seize the property as

19   evidence without issuing a hold order?

20            MS. YARBROUGH:  Can I get a standing

21       objection?  Every time you ask him to refer to

22       Chapter 539, I'm going to object to calling for a

23       legal conclusion.

24            MR. BEDARD: Yes.

25       Q.   (By Mr. Bedard) Want me to repeat the

1    question?

2        A.    Go ahead.

3        Q.    Is it your understanding of Section 539 that

4    if you find misappropriated property in a pawnshop that

5    you can seize that property and take it in for use in a

6    criminal investigation without issuing a hold order?

7        A.    You are saying I have to have a hold order

8    first; is that correct?

9        Q.    I'm asking you if it is your interpretation

10    that you have to.

11        A.    I don't think so.

12        Q.    You think you can take the property without a

13    hold order?

14        A.    Yes.

15        Q.    Is there anything in Section 539 which

16    permits you to do that?

17        A.    Well, at the top in section (a) it says you

18    may place a hold order, it doesn't say you have to.

19    The bottom says you can seize it.

20        Q.    Where does it say that?

21        A.    Actually it says more than that.

22        Q.    It says while a hold order is in effect?

23        MS. YARBROUGH:  I'm going to object to being

24        argumentative.

25        Q.    (By Mr. Bedard) The question was is there

1    anything in 539 that permits a law enforcement officer

2    to seize property from a pawnshop without issuing a

3    hold order?

4        A.   Section (16), subsection 2 does.

5        Q.   Where does it say that?

6        A.   That's the way I have interpreted it.

7        Q.   What sentence do you interpret it to waive

8    the hold order?

9        A.   Well, section (a) says you may, don't say you

10   have to.  And then Section 2 says you can request the

11   release of the property subject to the hold, which you

12   haven't done it because it says may up top.

13       Q.   Okay.  So, it's your position that law

14   enforcement -- that Section (16) in Section 539 is

15   purely discretionary and that law enforcement can

16   decide whether to follow this provision or not follow

17   it whenever they want?

18           MS. YARBROUGH:  Objection to form.

19       Q.   (By Mr. Bedard) Understand the question?

20       A.   Yes.

21       Q.   Your answer?

22       A.   Yes.

23       Q.   So your position is you don't have to follow

24   this law, you can follow it or not follow it at your

25   whim?

1              MS. YARBROUGH:  Object to the form.

2         A.    I believe we are with inside the law.

3         Q.    (By Mr. Bedard) I didn't say you weren't.

4    It's your position that this provision of the law, this

5    Section (16), the hold orders, you can -- there is no

6    legal requirement that you have to follow this?

7              MS. YARBROUGH:  Objection to form.

8         Q.    (By Mr. Bedard) Is that true, it's your

9    position that law enforcement is not bound by Section

10   (16) of 539 regarding hold orders?

11        A.    I think we went through this already.

12        Q.    Is it your position that you are bound by it

13   or not bound by it?

14        A.    We went through it already.

15        Q.    Can you answer it yes or no?

16        A.    I already did.

17        Q.    Going back to Exhibit 4, the Pawnshop

18   Inspection Checklist, it says however, personal or not,

19   every item in the store must have some proof of origin.

20              Anywhere in Section 539 does it say that

21   every item in a pawnshop must have some proof of

22   ownership or item in a pawnshop must have some proof of

23   origin?

24        A.    I found one of them, I'm looking for the

25   second one.

1        Q.   Where does it say that requires proof of

2   ownership be -- that requires every item in the store

3   have proof of ownership?

4        A.   Documentation where it came from.

5        Q.   Where does it say that, what section?

6        A.   Section (a).

7        Q.   Specifically where does it say that there has

8   to be proof of origin of every item in the store, can

9   you read it to me?

10       A.   Not origin, it does include origin because

11   you are including a particular information on the

12   customer who conveyed it to the store.

13       Q.   The question was, was there anyplace in

14   Section 539 that requires that a pawnshop owner --

15   requires that a pawnshop owner have proof that he owns

16   every item in the pawnshop and maintain proof on the

17   premises?

18           MS. YARBROUGH:  I object.  If he knows.

19           MR. BEDARD: Obviously he knows.

20           MS. YARBROUGH:  He didn't draft that

21     provision of the guideline.

22           MR. BEDARD: I asked him a question, if he

23     doesn't know he can answer that.  He can't answer

24     if he doesn't know.  It's implicit in every

25     question.

1       MS. YARBROUGH:  He's been sitting there

2   reading the statute for 20 minutes.

3       MR. BEDARD: He's been sitting there

4   two-and-a-half minutes.

5       MS. YARBROUGH:  He's not a lawyer or judge,

6   which goes back to my original objection.

7       MR. BEDARD: Through the years I found cops to

8   know no more about the law than the lawyers or

9   judges do, to be honest with you.

10      A.    There is a portion of Section (9) also.

11      Q.    (By Mr. Bedard) That requires that.  Okay.

12          Let me -- what provision -- is that the

13  provision that requires a pawnshop owner to maintain a

14  copy of the completed transaction form on the premises

15  for one year?

16      A.    That originates it, correct.

17      Q.    Is there any other areas, sections of this

18  statute that say that?

19      A.    There is one other that I am looking for and

20  I haven't found it yet.  Without going too much further

21  into it under section (2) Definitions and the

22  "permitted vendor".

23      Q.    All right.  Go ahead.  I'm sorry.  As a

24  police officer it's your opinion and interpretation of

25  Florida law that every item -- that a pawnshop owner is

1   required to show that he owns every item that is in his

2   pawnshop?

3           MS. YARBROUGH:  Object to the form.

4       A.   In some form.

5       Q.   (By Mr. Bedard) When you do an inspection of

6   a pawnshop, is it your understanding that for every

7   item in that pawnshop you have a right to inspect the

8   item and that the pawnshop owner has a legal obligation

9   to provide you any paperwork that shows how he obtained

10  the item?

11      A.   Yes.

12      Q.   So it's your understanding, as a police

13  officer, that when you inspect a pawnshop, you have the

14  right to go into the pawnshop, inspect every piece of

15  property in that pawnshop, and that if requested to do

16  so a pawnshop owner must provide for you the paperwork

17  on each piece of property in his pawnshop showing how

18  he came into title or came into possession of that

19  item?

20      A.   Yes.

21      Q.   And this is true whether that property has

22  been sitting in that pawnshop for ten years, 20 years,

23  or for six months?

24      A.   Correct.

25      Q.   And that interpretation of Section 539, your

1    interpretation, you have implemented that

2    interpretation when you inspected pawnshops; is that

3    correct?

4            MS. YARBROUGH:  Object to the form, he never

5        said he implemented 539.

6        A.    Yes.

7        Q.    (By Mr. Bedard) And this interpretation of

8    yours that you just stated on 539, your interpretation

9    and your implementation of it, this was derived -- was

10    a product of the training that you received from the

11    Broward County Sheriff's Office?

12        A.    It's from review of State Statute Section

13    (12) (b).

14        Q.    Section (12) (b).  And that says it's a crime

15    to refuse to allow the agency, the appropriate law

16    enforcement official, or the state attorney, or any of

17    their designated representatives having jurisdiction,

18    to inspect completed pawnbroker transaction forms or

19    pledged or purchased goods during the ordinary hours of

20    a pawnbroker's business or other times acceptable to

21    both parties, correct?

22        A.    Yes.

23        Q.    And it's your understanding of the law that a

24    pawnshop owner must allow you to inspect both the goods

25    and the forms underlying those goods that are in his

1    pawnshop? ·

2        A.    That's what you just read.

3        Q.    And if he has a piece of property in his

4    pawnshop that he has had there for ten years and that's

5    his own personal property and he cannot provide to you

6    when you walk into the pawnshop a form that underlies

7    that property, is it your position that you then have a

8    right to arrest him and seize that property as

9    evidence?

10        A.    Well, I don't know how long he has had

11    possession of that property or where it came from, it

12    could be undocumented.

13        Q.    If he can't produce a form, then you have a

14    right --

15        A.    Then it's undocumented.

16        Q.    Then you have a right to seize it and arrest

17    him?

18        MS. YARBROUGH:    Object to the form, compound

19        question.

20        A.    Yes.

21        Q.    (By Mr. Bedard) You say this right of law

22    enforcement is based on Section 539?

23        A.    Correct.

24        Q.    Take a look at section (9) (a).  It says the

25    following:  A pawnbroker must maintain a copy of each

1    pawnbroker transaction form on the pawnshop premises

2    for at least one year after the date of the

3    transaction.

4              So if you go into a pawnshop and do an

5    inspection, there is a piece of property for sale, it's

6    your position that despite this language, the owner

7    still has to produce for you the pawnbroker transaction

8    form even if it's been sitting there for five years?

9         A.   Yes.

10        Q.   So your interpretation of the law is that a

11   pawnbroker transaction form must be maintained on the

12   premises for as long as the property that it relates to

13   is on the premises?

14        A.   No, I didn't say that.

15        Q.   You did say that. You did say that it's your

16   interpretation that a pawnshop owner has to provide to

17   you a pawnbroker transaction form or some proof of

18   ownership of every piece of property in his pawnshop?

19             MS. YARBROUGH:  Is that the question?

20             MR. BEDARD: Yes.

21        Q.   (By Mr. Bedard) And your answer is yes?

22        A.   Yes.

23        Q.   And you still believe that, even though there

24   is a provision that only requires the forms to be kept

25   on the premises for one year after the date of the

1    transaction?

2         A.    That's correct there is.  There is also

3    computerized records that they keep that they can also

4    look up and show us.

5         Q.    Now, every pawnshop in Broward County uses a

6    computer in downloading their forms, correct?

7         A.    No.

8         Q.    That's not true?

9         A.    No, it's not.

10        Q.    Do you know of any that don't?

11        A.    Top of my head, one.

12        Q.    Do you know which one?

13        A.    Wald Jewelry (phonetic).

14        Q.    Take a look at -- withdraw the question.

15              Isn't it a fact, that under Florida law the

16   only right that you have to inspect property and

17   inspect pawnbroker transaction forms is during the 30

18   days or the 60 days -- either the 30 days after the

19   purchase or 60 days after the pawn, and you have no

20   right to inspect the property or the forms after that?

21              MS. YARBROUGH:  Object to the form.  Calls

22        for a legal conclusion.

23        A.    The section that we were at before didn't

24   have a time frame in there, business hours.

25        Q.    (By Mr. Bedard) Take a look at Section (9),

1    (9) (c).   It says the following:   All goods delivered

2    to a pawnbroker in a pawn or purchase transaction must

3    be securely stored and maintained in an unaltered

4    condition within the jurisdiction of the appropriate

5    law enforcement official for the period of 30 calendar

6    days after the transaction.   Those goods delivered to

7    the the pawnbroker in a purchase transaction may not be

8    sold or otherwise disposed of before the expiration of

9    such period.   The pawnbroker shall make all pledged and

10   purchased goods and all records relating to such goods

11   available for inspection by the appropriate law

12   enforcement official during normal business hours

13   throughout such period.

14           Now, you would agree, would you not, that

15   this law says that the only obligation a pawnshop owner

16   has in regards to inspections is that he only has to

17   allow you to inspect his goods and his records for 30

18   days, only during the 30 day period after the pawn?

19       A.   No.

20       Q.   That's not your interpretation?

21       A.   No.

22       Q.   What is your interpretation of that

23   provision?

24       A.   They have to keep it within the jurisdiction

25   for 30 days.

1    Q.    Correct.

2    A.    Where does it exclude an inspection after

3    that?

4    Q.    It says the pawnbroker shall make all pledged

5    and purchased goods and all records relating to such

6    goods available to the appropriate law enforcement

7    official during normal business hours throughout such

8    period.

9    A.    Okay.  Does it say it can't be inspected

10    after that period?  Does it?

11    Q.    I'm asking --

12    A.    I'm asking you, you are telling me it's

13    within that period.

14    Q.    Would you agree with me that this provision

15    requires, requires, a pawnshop owner to allow his goods

16    to be inspected, and the records, only for 30 days

17    after the transaction?

18    A.    No.

19    Q.    Your interpretation of this section is that

20    the pawnbroker is required to make all pledged and

21    purchased goods and all records relating to such goods

22    available for inspection at any time?

23    A.    Yes.

24    Q.    Okay.  Is it your opinion that when you go

25    into a pawnshop and you ask a pawnshop owner to provide

1    you with documentation for every piece of property in

2    his pawnshop, and if he refuses to do so at that point

3    in time and he just says I don't have them, is it your

4    position that you can arrest him at that point and

5    seize the property as evidence?

6         A.    Yes.

7         Q.    You are absolutely certain of that?

8         A.    You asked my opinion, yes.

9         Q.    Take a look at Section (9) (b) of Section 539

10   and let's assume that the pawnshop you go into is not

11   the one that doesn't download, this one uses

12   computerized -- uses a computer like, I guess, everyone

13   except one does.

14             Now, I direct your attention to in the middle

15   of the paragraph.  It says in the event the pawnbroker

16   transfers pawn transactions electronically, the

17   pawnbroker is not required to also deliver to the

18   appropriate law enforcement official the original or

19   copies of the pawnbroker transaction forms.  The

20   appropriate law enforcement official may, for the

21   purposes of a criminal investigation, request that the

22   pawnbroker produce an original of that transaction that

23   has been electronically transferred.  The pawnbroker

24   shall deliver this form to the appropriate law

25   enforcement official within 24 hours of the request.

1          So if you go into a pawnshop and here's a

2    cell phone, I want the pawn transaction form for that

3    cell phone, and if he tells you I don't have it, well,

4    I will give it to you tomorrow, has he committed a

5    crime?

6          A.    I would go further if I need to see where the

7    origin was.  Show me the electronic version.

8          Q.    If you ask him for the transaction form and

9    he says I'm sorry, Officer, I don't have it, come by

10   tomorrow and I will give it to you.  At that point has

11   he committed a crime?

12         A.    It depends on the circumstances of the

13   investigation.

14         Q.    My question is at that point --

15         A.    It depends on the circumstances.

16         MS. YARBROUGH:  Let him finish his question.

17         Q.    (By Mr. Bedard) At that point has he

18   committed a violation of Section 539?

19         MS. YARBROUGH:  Objection, improper

20         hypothetical.  Go ahead.

21         A.    Depends on the circumstances of the

22   investigation.

23         Q.    (By Mr. Bedard) Would you be able to seize

24   his property as evidence?

25         A.    Depends on the circumstances of the

1    investigation.

2        Q.    What circumstances?

3        A.    Depends on the investigation.  If I just need

4    the pawn form and he says he does not have it, and I

5    know the record is there electronically I can give him

6    the next day, because I know the electronic record is

7    there.  If I come in and pull the item off the shelf

8    and I say let me see the form and he does not have it

9    and I say let me see the electronic record of it and he

10   does not have it, then that's a circumstance of a

11   different investigation.  There is different things

12   there.

13       Q.    Direct your attention to November 30th when

14   you did the inspection at We Buy Pawnbrokers at 3481

15   Northwest 19th Street.  Would you tell me what happened

16   when you did the inspection?

17       A.    Can you be a little more specific than that?

18       Q.    You went in there, who was with you when you

19   did the inspection?

20       A.    Sergeant Sileo.

21       Q.    Why did you go the pawnshop to do the

22   inspection?

23       A.    We received information from another agency

24   that they had some property there that was not properly

25   documented.

1          Q.    Was your purpose in going there to do an

2    inspection or was it part of a criminal investigation?

3          A.    It was an inspection.

4          Q.    Was it an inspection pursuant to Section 539?

5          A.    Yes.

6          Q.    And it was you and Sergeant Sileo?

7          A.    Yes.

8          Q.    What happened when you went into the

9    pawnshop?

10         A.    We advised Mr. Goldstein, who was there, that

11   we were going to do an inspection.

12         Q.    What did he say to you?

13         A.    I can't recall his exact words.

14         Q.    When you did the inspection where did you go

15   and what did you do?

16         A.    We went back behind the counter and in the

17   back room, the back warehouse, basically.

18         Q.    What were you looking for?

19         A.    Items that didn't have stickers on them.  The

20   system they use generates a sticker for every item that

21   comes in.  Looking for the sticker document referred

22   back to the original form.  Those items that didn't

23   have stickers on them and they couldn't find anything

24   in the computer for them, those are the items that we

25   did seize.

1      Q.   You seized -- I believe I have one of the

2    exhibits.  Plaintiff's Exhibit 2, the items -- why did

3    you seize these items?

4      A.   They didn't have any documentation as to

5    their origin.

6      Q.   Meaning Mr. Goldstein was unable to provide

7    you a pawn transaction form?

8      A.   Or any electronic records of them.

9      Q.   Did you ever ask him or tell him that he had

10   24 hours in which to provide you this information under

11   law?

12     A.   No, we stayed and waited for the electronic

13   version right then and there.  He was given the

14   opportunity to go in his system and look for any of

15   them, which he did for some.

16     Q.   Now, these electronic records BSO would have

17   had copies of themselves, because he would have

18   downloaded them into your computer?

19     A.   Not directly, but yes.

20     Q.   The information that you asked him for you

21   would have had it back at the police station?

22     A.   Yes.

23     Q.   If you wanted to review all the pawns he had

24   done for the last year you could have done so,

25   correct?

1          A.    Yes.

2          Q.    And you would have known every pawn he has

3     done within the last year?

4          A.    Correct.  That were documented, put it that

5     way.

6          Q.    That were documented.  Obviously.  So you

7     went to the pawnshop and you didn't have a search

8     warrant?

9          A.    Correct.

10          Q.    And you seized all the the items contained in

11     Plaintiff's Exhibit 2, correct?

12          A.    Without looking through every page, yes.

13     Approximately 20 of them.

14          Q.    And the reason these items were seized is

15     because Mr. Goldstein at that point in time was not

16     able to provide you with documentation as to the origin

17     of these items?

18          A.    Correct.

19          Q.    And that seizure of these items was pursuant

20     to the Pawnshop Inspection Checklist that is introduced

21     as Plaintiff's Exhibit 4, correct?

22          A.    Like I said before, I never used the

23     checklist, I just go by the statute.

24          Q.    So you are saying your search and seizure of

25     these items was conducted pursuant to Section 539?

36

```
1         A.    Yes.  Validly.

2         Q.    What about Mr. Goldstein's personal property?

3         A.    What personal property?

4         Q.    There was a computer, a gun, and a coin

5    collection that was taken, it was his personal

6    property?

7         A.    What about it?

8         Q.    Why did you take that?

9         A.    Again, it was more property mixed in with all

10   the rest of it that had no documentation.

11        Q.    Did you ever have a conversation with

12   Mr. Goldstein or Mr. Goldstein's son in which they

13   informed you that the computer, the coins and the

14   weapon were their personal property?

15        A.    Yeah, he said he bought the computer at the

16   flea market.  I asked him what operating system was in

17   it and he didn't know.  The gun, he said was his son's

18   was a piece of junk, wouldn't let him carry it.  Later

19   found out it was stolen out of Metro Dade about 20

20   years ago.

21        Q.    At the time you took all of this property, at

22   that time that it was seized, did you have any reason

23   to believe that any of it was stolen?

24        A.    No.  At the time, no.

25        Q.    Did you have any reason to believe that it
```

1    was not owned by Mr. Goldstein or We Buy Pawnbrokers?

2        A.    No.

3        Q.    In fact, on the form you will see in Exhibit

4    2, on each of the forms there is an owner listed of the

5    property and the owner says same as suspect?

6        A.    Correct.

7        Q.    So when you seized this property at that time

8    you were obviously under the impression that We Buy

9    Pawnbrokers was the owner of the property that you

10    seized?

11            MS. YARBROUGH:  Object to the form.

12        A.    What's your point in that?  We never said it

13    wasn't theirs at the time.

14        Q.    That's my point; when you took the property,

15    in your mind, it belonged to them?

16        A.    We never said it wasn't theirs.

17        Q.    Correct.  So when you seized the property you

18    were under the impression that that property belonged

19    to We Buy Pawnbrokers?

20            MS. YARBROUGH:  Object to the form.

21        Q.    (By Mr. Bedard) Correct?

22        A.    Yes.

23        Q.    You have the victim's name, what does S-O-F

24    mean?

25        A.    State of Florida.

1      Q.   Is it also your position that if a pawnbroker

2   brings personal property into a pawnshop he must also

3   provide, upon request, proof of ownership or proof of

4   origin for that property to law enforcement?

5      A.   It's I would say a discretionary area.

6      Q.   You can take it if you want?

7      A.   It's a discretionary area.

8      Q.   Is there any reason why you didn't apply for

9   a search warrant?

10      A.   Based on the statute you don't need one to do

11   an inspection.

12      Q.   How about a seizure, is there anything in the

13   statute that allows you, other than the hold provision,

14   that allows you to seize property?

15      A.   Basic rules of evidence.  If that's the item

16   that is evidence, being nondocumented that's the

17   evidence itself, we can seize the evidence.

18      Q.   It's your position that there is nothing in

19   539 that allows you to do that?

20          MS. YARBROUGH:  Object to the form.

21      A.   Yeah, it says we can inspect.

22      Q.   (By Mr. Bedard) Does it say you can seize?

23      A.   No, it doesn't.

24      Q.   So there is nothing in here?

25      A.   It also says there is no documentation --

1          MS. YARBROUGH:   There is no question

2      pending.

3          Q.   (By Mr. Bedard) It's your position that you

4      do not need a search warrant?

5          A.   Correct.

6          Q.   It's your position at that time the provision

7      of law that We Buy pawnbrokers was violating was

8      Section (12) Subsection (b)?

9          A.   I wouldn't say that's worded appropriately

10     for that.

11         Q.   Which section of (12) did he violate?

12         A.   (m).

13         MS. YARBROUGH:   Object to the form.

14         A.   (By the Witness) (8) (a) looks more

15     appropriate.

16         Q.   So you are saying that We Buy Pawnbrokers

17     falsified or intentionally failed to make an entry of

18     any material matter in pawnbroker transaction form?

19         A.   Where are you reading that from?

20         Q.   (12) (a)?

21         A.   I said (8) (a).

22         Q.   That's the willful provision, correct?

23         Okay.  Now where is the provision of law that

24     criminalizes Section (8) (a)?

25         MS. YARBROUGH:   Object to the form.